UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MAINE PRESS ASSOCIATION AND MAINE ASSOCIATION OF BROADCASTERS,<br><br>**Plaintiffs,**<br><br>v.<br><br>MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, DAVID R. HASTINGS III, SARAH E. LECLAIRE, DENNIS MARBLE, STACEY D. NEUMANN, AND WILLIAM J. SCHNEIDER, IN THEIR CAPACITY AS MEMBERS OF THE COMMISSION; AND AARON FREY, IN HIS CAPACITY AS ATTORNEY GENERAL,<br><br>**Defendants.** | Civil Action No. _____<br><br>**INJUNCTIVE RELIEF SOUGHT** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Maine Press Association and Maine Association of Broadcasters file this Complaint for Declaratory and Injunctive Relief against Defendants Maine Commission on Governmental Ethics and Election Practices (and its five members, in their official capacities), and Aaron Frey in his capacity as Attorney General of the State of Maine.

**Nature of the Action**

A new Maine statute that bans political advertising by "foreign government-influenced entit[ies]" has a remarkable feature of special concern to news organizations: the statute creates a rule about who may engage in political advertising, and then purports to enlist news outlets to enforce that rule. The requirement that news outlets "shall establish due diligence policies, procedures and controls that are reasonably designed to ensure" that they do not run ads that are paid for by "foreign government-influenced

1

entit[ies]" is unconstitutional because it is impossible for news organizations to know what is required to comply with this unprecedented and vague standard; because it burdens First Amendment activities by appearing to require news outlets to conduct complex and costly global investigations into every entity that either owns or participates in the decision-making process of a prospective advertiser; because it imposes an unconstitutional prior restraint by requiring news outlets to do due diligence before running ads and then immediately take down political ads that may violate the statute without due process; and because it imposes liability and penalties on news organizations without fault. These requirements violate the rights of news outlets under the First and Fourteenth Amendments, and the Court should strike them down. If the State wishes to impose restrictions on political advertising by foreign government-influenced entities it should enforce those restrictions itself, not commandeer news outlets to enforce them on its behalf.

**Parties**

1. Plaintiff Maine Press Association is a Maine non-profit corporation that represents 6 daily newspapers, more than 35 weekly newspapers, 5 digital publications, and 1 student newspaper in Maine on issues of interest and concern to its members.

2. Plaintiff Maine Broadcasters Association is a Maine nonprofit corporation that represents over 130 radio and television stations in Maine on issues of interest and concern to its members.

3. The Plaintiffs are referred to collectively as the "Media Plaintiffs."

4.  Defendants David R. Hastings III, Sarah E. LeClaire, Dennis Marble, Stacey D. Neumann, and William J. Schneider (Chairman) are the five members of the Maine Commission on Governmental Ethics and Election Practices.

5.  The Maine Commission on Governmental and Election Practices is an independent Maine state agency established under Title 1, section 1002.

6.  Aaron Frey is the Attorney General of the State of Maine. He is Maine's chief law enforcement officer and is authorized to prosecute claims under state law for civil monetary penalties.

## Jurisdiction and Venue

7.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because these claims arise under the Constitution of the United States and pursuant to 28 U.S.C. § 1343 because this action involves a request for equitable or other relief under an Act of Congress providing for the protection of civil rights.

8.  Venue in this district is proper under 28 U.S.C. § 1391(b) because the defendants reside in this district and a substantial part of the events and omissions giving rise to the claims occurred here.

## Statement of Facts

*The Act*

9.  A new Maine statute that is expected to go into effect on January 6, 2024—*An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution* (the "Act")—prohibits spending on political campaigns by a "foreign government-influenced entity." The Act is to be codified at Title 21-A, section 1064 of the Maine Revised Statutes Annotated.

21242346.2

10. The Act was introduced as legislation as L.D. 1610 and passed by the Maine Legislature earlier this year, but it was vetoed by Governor Janet T. Mills on July 19, 2023. She wrote in her veto letter:

> [W]hile I strongly support and share the desire to prevent foreign influence in our elections, the language of the bill is too broad and would likely result in the unintended consequence of effectively silencing legitimate voices, including Maine-based businesses, in debates that would impact their interests.
>
> On top of this concern, L.D. 1610 also attempts to regulate the activities of the press and other media outlets, which I believe runs afoul of the First Amendment and is counter to the longstanding tradition and cornerstone of a free press in America.

The Maine Legislature upheld the Governor's veto.

11. The Act then went on the ballot as Question 2 in a statewide referendum. The referendum passed on November 6, 2023. The question on the ballot did not identify for voters the burdens the Act places on Maine news outlets or its First Amendment implications.

12. The Act would regulate both political advertisers and news outlets that run political ads.

13. As applied to political advertisers, the Act provides that a foreign government or "foreign government-influenced entity" may not "make, directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum." 21-A M.R.S.A. § 1064(2).

14. A "foreign government-influenced entity" is defined as a foreign government or an entity with respect to which a foreign government or foreign government-owned entity "(a) Holds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total . . . ownership interests; or (b) Directs, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the . . . entity to influence the nomination or election of a candidate or the initiation or approval of a referendum . . . ." 21-A M.R.S.A. § 1064(1)(E).

15. In simple terms, "foreign government-influenced entit[ies]" are entities with respect to which a foreign government (or another foreign government-influenced entity) either (1) has an ownership stake of five percent or more, or (2) directly or indirectly participates in decision-making about the entity's efforts to influence Maine elections and referenda.

16. The Act prohibits "foreign government-influenced entit[ies]" from spending money to influence Maine elections and referenda.

17. In addition to regulating political advertisers, the Act enlists news outlets that run political ads to enforce its prohibition against campaign expenditures by foreign government-influenced entities.

18. This is done in subsection 7, which requires that "[e]ach television or radio broadcasting station, provider of cable or satellite television, print news outlet and Internet platform shall establish due diligence policies, procedures and controls that are reasonably designed to ensure that it does not broadcast, distribute or otherwise make available to the public a public communication for which a foreign government-influenced entity has made

an expenditure, independent expenditure, electioneering communication or disbursement in violation of this section." 21-A M.R.S.A. § 1064(7).

19. In other words, subsection 7 requires that every Maine news outlet that runs political ads "establish due diligence policies, procedures and controls that are reasonably designed to ensure" that it does not run a political ad that was paid for by a foreign government-influenced entity.

20. The phrase "due diligence policies, procedures and controls" is not defined.

21. Subsection 7 further requires that "[i]f an Internet platform discovers that it has distributed a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement in violation of this section, the Internet platform shall immediately remove the communication and notify the [Commission on Governmental Ethics and Election Practices]." 21-A M.R.S.A. § 1064(7).

22. Under the Act, "[t]he [Commission on Governmental Ethics and Election Practices] may assess a penalty of not more than $5,000 or double the amount of the contribution, expenditure, independent expenditure, electioneering communication, donation or disbursement involved in the violation, whichever is greater, for a violation of this section." 21-A M.R.S.A. § 1064(8).

*Vagueness*

23. Key provisions of subsection 7 are too vague to give persons of ordinary intelligence fair warning of what the law requires.

24. The Media Plaintiffs do not understand what the phrase "due diligence policies, procedures and controls" means in the context of the Act, or how they would go

about complying with that requirement or ascertaining whether they have succeeded in doing so. Are news outlets required to hire accountants and detectives and attorneys to conduct a global investigation to determine who owns and influences every prospective political advertiser? How extensive must their investigation be? What steps must be taken? The Act does not say.

25. The Media Plaintiffs have never had policies, procedures or controls in place to determine whether prospective advertisers are "foreign government-influenced," and are unaware of any news outlets that have such policies, procedures, or controls, so there is no known precedent for news outlets to look to in construing subsection 7.

26. "[D]ue diligence policies, procedures and controls" is not a term of art in the news business, and in the absence of a statutory definition the Media Plaintiffs are left to guess at what it means.

27. Because this crucial provision of subsection 7 is inscrutable, the Media Plaintiffs have no way of knowing what they would have to do to comply. The result is a chilling effect on publication and broadcast of political speech in Maine.

*Burden on First Amendment Activities*

28. While it is unclear what the Act requires, one plausible interpretation is that it requires news outlets to conduct their own independent investigation into the ownership structure and sources of influence over every potential political advertiser.

29. That would require an enormous amount of very complicated work that Maine news outlets do not have the expertise or financial capacity to perform.

7

30. Modern business entities often have complex and secretive ownership structures that require extensive research, investigation, and legal training to uncover and understand.

31. Maine news outlets do not have the personnel or expertise that would be required to perform this work, or the financial resources to hire professionals who have that expertise, every time they run a political ad.

32. The Act does not just require news outlets to determine who *owns* as little as a five percent interest in a prospective advertiser. The Act defines a "foreign government-influenced entity" as (in addition to a foreign government) *either* an entity five percent or more of which is owned by a foreign government (or another foreign government-owned entity), *or* an entity with respect to which a foreign government (or another foreign government-owned entity) "[d]irects, dictates, controls or directly or *indirectly participates in the decision-making process* with regard to the activities of the . . . entity to influence the nomination or election of a candidate or the initiation or approval of a referendum . . . ." 21-A M.R.S.A. § 1064(1)(E) (emphasis added).

33. The Act therefore requires news outlets to ascertain, for every prospective political advertiser, whether a foreign government (or another foreign government-owned entity), even if it has no ownership stake in the advertiser, "indirectly participates in the decision-making process with regard to" the prospective advertiser's activities.

34. There is no list of "foreign government-influenced entities"—a term the Act invented—that news outlets could consult.

35. If required to expend their own resources to do what should be the State's job of enforcing the Act's rule against foreign government-influenced entities paying for

political ads, news outlets would have to do things like hiring and training new staff and retaining outside investigators and attorneys.

36. This would divert scarce financial and personnel resources away from reporting the news.

37. Even if news outlets had unlimited personnel and financial resources to do the massive amount of work that would be required to figure out who owns or "indirectly participates in the decision-making process" of every prospective political advertiser, it is unclear how it would be possible for a news outlet to "ensure" that it has not missed some owner or indirect participant in the decision-making process, or even to reasonably believe it had done so.

38. The difficulties presented by the due diligence requirement in the Act would be present even if Maine news outlets had unlimited resources to devote to the project of enforcing the State's rule against campaign spending by foreign government-influenced entities, which they do not in fact have.

*Chilling Effect*

39. The Media Plaintiffs do not know what the phrase "due diligence policies, procedures and controls" in subsection 7 means. But erring on the side of caution by giving it an expansive reading and setting up elaborate mechanisms for screening prospective advertisers for foreign government influence is not a realistic option given the financial pressure the news business is under.

40. Instead, to avoid legal risk, some of the nearly 200 members of the Media Plaintiffs may have to stop running political ads altogether.

9

41. To the extent that news outlets continue to run political ads, their publication could be substantially delayed while due diligence activities are undertaken.

42. Some ads that were not in fact paid for by foreign government-influenced entities could end up not being run at all because news outlets are unable to ensure that the ads do not violate the Act.

43. The loss of revenue from political advertising would negatively impact the financing of news organizations that are supported by advertising revenue, as most news outlets are.

44. The reduction or disappearance of political advertising would also negatively impact readers, viewers, and listeners of news outlets by reducing the amount of information that is available to them about public issues.

45. Enforcement of the due diligence requirement in subsection 7 would therefore have a dramatic chilling effect on political speech.

## COUNT I
### Violation of the Fourteenth and First Amendments and 42 U.S.C. § 1983
### (void for vagueness)

46. The Media Plaintiffs incorporate by reference here the preceding paragraphs.

47. The provision that every news outlet in Maine "shall establish due diligence policies, procedures and controls that are reasonably designed to ensure that it does not broadcast, distribute or otherwise make available to the public a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement in violation of [the Act]" is unconstitutionally vague.

48. It therefore subjects members of the Media Plaintiffs to penalties without due process of law and violates the First Amendment.

49. To remedy this constitutional violation, under 28 U.S.C. § 2201 and 42 U.S.C. § 1983, the Media Plaintiffs seek a declaration that the challenged provision is unconstitutional and a preliminary and permanent injunction enjoining Defendants and their agents from enforcing it.

## COUNT II
### Violation of the First Amendment and 42 U.S.C. § 1983
### (unconstitutional burden on news outlets)

50. The Media Plaintiffs incorporate by reference here the preceding paragraphs.

51. The provision of subsection 7 of the Act that every news outlet in Maine "shall establish due diligence policies, procedures and controls that are reasonably designed to ensure that it does not broadcast, distribute or otherwise make available to the public a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement in violation of [the Act]" imposes an unconstitutional burden on the members of the Media Plaintiffs in violation of the freedom of the press and freedom of speech.

52. Maine news outlets do not have the resources or expertise that would be required to ascertain whether prospective advertisers are "foreign government-influenced entit[ies]."

53. The Act substantially burdens core political speech and the freedom of the press.

54. The "due diligence policies, procedures and controls" requirement does not withstand strict scrutiny because it is not the least restrictive means of advancing a compelling governmental interest and is not narrowly tailored to do so.

55. To remedy this constitutional violation, under 28 U.S.C. § 2201 and 42 U.S.C. § 1983, the Media Plaintiffs seek a declaration that the challenged provision is unconstitutional and a preliminary and permanent injunction enjoining Defendants and their agents from enforcing it.

## COUNT III
## Violation of the First Amendment and 42 U.S.C. § 1983
## (prior restraint)

56. The Media Plaintiffs incorporate by reference here the preceding paragraphs.

57. The provision in subsection 7 of the Act that "[i]f an Internet platform discovers that it has distributed a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement in violation of this section, the Internet platform *shall immediately remove* the communication and notify the commission" (emphasis added) is an unconstitutional prior restraint that violates the First Amendment.

58. Subsection 7 of the Act is an unconstitutional prior restraint because it imposes a categorical ban on political speech by certain speakers in advance of their speaking and regardless of the circumstances of their speech, and requires news outlets to "immediately remove" political speech upon discovery without any procedural safeguards.

59. The requirement in subsection 7 of the Act that news outlets engage in "due diligence policies, procedures and controls" before publishing or broadcasting a political ad is also an unconstitutional prior restraint that violates the First Amendment because it

12

mandates that news outlets not publish political ads without having first engaged in some form of due diligence and because that process lacks any procedural safeguards.

60. These prior restraints are not the least restrictive means of advancing a compelling governmental interest, are not narrowly tailored to do so, and incorporate no mechanism for prompt judicial review or other procedural safeguards.

61. To remedy this constitutional problem, under 28 U.S.C. § 2201 and 42 U.S.C. § 1983, the Media Plaintiffs seek a declaration that the challenged provision is unconstitutional and a preliminary and permanent injunction enjoining Defendants and their agents from enforcing it.

## COUNT IV
### Violation of the First Amendment and 42 U.S.C. § 1983
### (strict liability for publication political speech)

62. The Media Plaintiffs incorporate by reference here the preceding paragraphs.

63. To enforce the Act, subsection 8 imposes liability and penalties on news outlets whether or not they are at fault. Even if a violation of the Act is inadvertent, subsection 8 authorizes the Commission on Governmental Ethics and Election Practices to impose fines of up to $5,000 or double the amount spent on advertising political speech.

64. Because of the chilling effect on protected speech and for other reasons, the First Amendment prohibits the imposition of penalties on publishers of political speech in the absence of fault.

65. Because subsection 8 establishes strict liability as the standard for the imposition of penalties for the publication of political speech, it is unconstitutional.

66. To remedy this constitutional problem, under 28 U.S.C. § 2201 and 42 U.S.C. § 1983, the Media Plaintiffs seek a declaration that the challenged provision is

21242346.2

unconstitutional and a preliminary and permanent injunction enjoining Defendants and their agents from enforcing it.

**PRAYER FOR RELIEF**

WHEREFORE, the Media Plaintiffs respectfully request that the Court:

A. Declare that subsections 7 and 8 of the Act are unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

B. Enter preliminary and permanent injunctions enjoining Defendants and their agents from enforcing subsection 7 and 8 of the Act;

C. Award the Media Plaintiffs their costs and reasonable attorneys' fees under 42 U.S.C. § 1988; and

D. Grant the Media Plaintiffs such other relief as the Court deems just and proper.

21242346.2

Dated at Portland, Maine this 12th day of December, 2023.

        Respectfully Submitted,
        MAINE PRESS ASSOCIATION AND MAINE ASSOCIATION OF BROADCASTERS

        by their attorneys,
        PRETI FLAHERTY BELIVEAU & PACHIOS, LLP

        */s/ Sigmund D. Schutz*
        Sigmund D. Schutz
        Benjamin S. Piper
        Jonathan G. Mermin
        Alexandra A. Harriman
        One City Center
        P. O. Box 9546
        Portland, ME  04112-9546
        (207) 791-3000
        sschutz@preti.com
        bpiper@preti.com
        jmermin@preti.com
        aharriman@preti.com