## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **MAINE PRESS ASSOCIATION AND MAINE ASSOCIATION OF BROADCASTERS,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **MAINE COMMISSION ON GOVERNMENTAL** ) | Civil Action No. _____ |
| **ETHICS AND ELECTION PRACTICES, DAVID** ) | |
| **R. HASTINGS III, SARAH E. LECLAIRE,** ) | |
| **DENNIS MARBLE, STACEY D. NEUMANN,** ) | |
| **AND WILLIAM J. SCHNEIDER, IN THEIR** ) | |
| **CAPACITY AS MEMBERS OF THE** ) | |
| **COMMISSION; AND AARON FREY, IN HIS** ) | |
| **CAPACITY AS ATTORNEY GENERAL,** ) | |
| ) | |
| **Defendants.** ) | |

# PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Maine Press Association and Maine Association of Broadcasters (the "Media Plaintiffs") move for a preliminary injunction on the ground that the Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution, 21-A M.R.S. § 1064 (the "Act"), violates their rights under the First and Fourteenth Amendments to the United States Constitution.

## FACTUAL BACKGROUND

Under the Act, a foreign government or "foreign government-influenced entity" may not spend money to influence a Maine election. A "foreign government-influenced entity" is an entity with respect to which a foreign government (or another foreign government-influenced entity) either (1) has an ownership stake of five percent or more, or (2) directly or indirectly participates in decision-making about the entity's efforts to influence Maine elections and referenda. *Id.* § 1064(1)(E).

In addition to regulating political advertisers, the Act enlists news outlets that run political ads to enforce its prohibition against campaign expenditures by foreign government-influenced entities. This is done in subsection 7, which requires that Maine news outlets that publish political ads "establish due diligence policies, procedures and controls that are reasonably designed to ensure" that they do not run ads that were paid for by a foreign government-influenced entity. *Id.* § 1064(7). The Act does not explain what "due diligence policies, procedures and controls" means.

Subsection 7 further requires that if "an Internet platform discovers" that it has run a political ad in violation of the Act it "shall immediately remove the communication and notify the [Commission on Governmental Ethics and Election Practices]." 21-A M.R.S. § 1064(7). Under subsection 8, in the event of a violation the Commission may assess penalties of up to

1

$5,000 or double the amount of the expenditures, whichever is greater, even if the violator is not at fault for the violation. 21-A M.R.S. § 1064(8).

## ARGUMENT

In ruling on a motion for preliminary injunction the Court considers "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). "But the four factors are not entitled to equal weight in the decisional calculus; rather, [l]ikelihood of success is the main bearing wall of the four-factor framework." *Id.* at 9–10 (quotation marks omitted).

I.   **The Media Plaintiffs are likely to succeed on the merits of their claims.**

**A.   Subsection 7 is unconstitutionally vague.**

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id.* "In prohibiting overly vague laws, the doctrine seeks to ensure that persons of ordinary intelligence have fair warning of what a law prohibits" and to "prevent arbitrary and discriminatory enforcement of laws by requiring that they provide explicit standards for those who apply them . . . ." *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 62 (1st Cir. 2011) (quotation marks omitted). "Where First Amendment rights are involved, an even greater degree of specificity is required." *Buckley v. Valeo*, 424 U.S. 1, 77 (1976) (quotation marks omitted). That is because "where a vague statute abut(s) upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms." *Grayned*, 408 U.S.

at 109 (quotation marks and footnote omitted). "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Id*. (quotation marks omitted).

A law that "limits or conditions in advance the exercise of protected First Amendment activity" is analyzed as a prior restraint. A prior restraint on expression is subject to a heightened standard of precision: such restraints "have to contain 'narrow, objective, and definite standards' to guide" decisions to approve or reject speech. *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 20 n.15 (1st Cir. 2007) (quoting *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)). As detailed below, the Act is a prior restraint because it requires that foreign government-influenced political advertisements be screened out and censored *before* they are published, and although news outlets rather than the government are charged with doing the screening and censoring, the State cannot commandeer third parties to do for it what the State cannot constitutionally do itself. To pass constitutional muster the Act's standards therefore must be narrow, objective, and definite. *Garcia-Padilla*, 490 F.3d at 20 n.15.

Key provisions of subsection 7 are unconstitutionally vague. Because the terms are not defined, the Media Plaintiffs are left to guess at the meaning of the phrase "due diligence policies, procedures and controls," or how they would go about complying with that requirement or ascertaining whether they had succeeded in doing so. *See* Decl. of Jody Jalbert (**Ex. A**) ¶¶ 10–13; Decl. of Judith Meyer (**Ex. B**) ¶¶ 12–15; Decl. of Timothy Moore (**Ex. C**) ¶¶ 9–14; Decl. of Courtney Spencer (**Ex. D**) ¶¶ 11–14. Are news outlets required to hire investigators and attorneys to determine who owns and influences every prospective political advertiser? How extensive must their investigation be? What standards should guide it? What investigative steps must be taken? What are "policies, procedures and controls," and what is the difference between

these things? The Act makes none of this at all clear. As the Media Plaintiffs have never used policies, procedures, or controls to determine whether advertisers are "foreign government-influenced," and are unaware of any news outlets that have done so, there is no known precedent for news outlets to look to in construing subsection 7. "[D]ue diligence policies, procedures and controls" is not a term of art in the news business, and in the absence of a definition the Media Plaintiffs have no idea what it means. Because this crucial provision of subsection 7 is inscrutable, the Media Plaintiffs do not know what they have to do to avoid being fined under subsection 8. The upshot is that the Act forces new outlets to "steer far wide[] of the unlawful zone," *Grayned*, 408 U.S. at 109, and incentivizes them to stop running political ads altogether.

Because subsection 7 does not establish a narrow, objective and definite standard for establishing "due diligences policies, procedures, and controls," it is unconstitutional.

### B.  Subsection 7's burden on news outlets is unconstitutional and it fails strict scrutiny review.

If subsection 7 is not unconstitutionally vague, it places an unconstitutional burden on news outlets. If "due diligence policies, procedures and controls" means anything, the plain import of the words would indicate that news outlets are required to conduct some form of investigation into the global ownership structure of each prospective political advertiser before publishing their speech. That is not something Maine news outlets can realistically do. And it is not a burden the First Amendment permits the State to impose on the press. Lest there be any doubt, the First Amendment applies to the publication of political advertisements. *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995) ("[T]he simple selection of a paid noncommercial advertisement for inclusion in a daily paper" is "squarely within the core of First Amendment security . . . .").

**1. Subsection 7's due diligence requirements impermissibly burden the freedom of the press.**

This much is clear: the Act imposes a special burden on news organizations by requiring them to conduct some sort of investigation into the ownership of, and the sources of influence over, every political advertiser. That burden implicates the freedom of the press. *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom  . . . of the press . . . ."). And the burden imposed by the Act is a substantial one. Modern business entities often have complex ownership structures that require extensive research, investigation, and legal training to uncover and understand. Many businesses and organizations keep their ownership structure secret, or obscure their true beneficial owners under layers of interrelated legal entities about which little or no information is available to outsiders. To reasonably "ensure" that a political ad was not paid for by a "foreign government-influenced entity," if it is even possible to do so, would require an extraordinary amount of work that news outlets have neither the personnel, the expertise, nor the financial capacity to perform. *See* Decl. of David Abel (**Ex. E**) ¶¶ 6–10; Jalbert Decl. ¶¶ 14–21; Meyer Decl. ¶¶ 17–25; Moore Decl. ¶¶ 15–23; Spencer Decl. ¶¶ 15–25.

There is no list of "foreign government-influenced entities"—a term the Act invents— that news outlets could consult. If required to expend their own resources to do what should be the State's job of enforcing the new rule against foreign government-influenced entities paying for political ads, news outlets would seemingly have to hire and train new staff and retain outside investigators and attorneys. This would divert scarce resources away from the core First Amendment activity of reporting the news. Even if news outlets had unlimited personnel and financial resources to do the massive amount of work that would be required to even begin to attempt to figure out who owns or "indirectly participates in the decision-making process" of every prospective political advertiser, it is unclear how it would be possible for a news outlet to

21245724.1

reasonably "ensure" that it has not missed some owner or indirect decision-making participant. We are aware of no other law in the United States that requires so much of the press before it can exercise its basic First Amendment right to serve as a platform for political speech.

The extent of what the Act demands is extraordinary. It does not just require news outlets to determine whether a foreign government *owns* as little as five percent of an advertiser. Instead, the Act defines a "foreign government-influenced entity" as *either* an entity five percent or more of which is owned by a foreign government (or another foreign government-owned entity), *or* an entity where a foreign government (or another foreign government-owned entity) "[d]irects, dictates, controls or directly or *indirectly participates in the decision-making process with regard to* the activities of the . . . entity to influence the nomination or election of a candidate or the initiation or approval of a referendum . . . ." 21-A M.R.S. § 1064(1)(E). The Act thus requires news outlets to ascertain, for every political advertiser, whether a foreign government (or another foreign government-influenced entity), even if it has *no ownership stake* in the advertiser, "indirectly participates in the decision-making process with regard to" the advertiser's activities. That is not a task news outlets can plausibly be expected to complete, or a burden the State may constitutionally impose. *See Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967) ("We create a grave risk of serious impairment of the indispensable service of a free press in a free society if we saddle the press with the impossible burden of verifying to a certainty the facts associated in news articles with a person's name, picture or portrait . . . ."); *Braun v. Soldier of Fortune Mag., Inc.*, 968 F.2d 1110, 1117 (11th Cir. 1992) ("[I]f state . . . law places too heavy a burden on publishers with respect to the advertisements they print, the fear of liability might impermissibly impose a form of self-censorship on publishers. Such a chilling effect would compromise the First Amendment interest in commercial speech by depriving protected speech

of a legitimate and recognized avenue of access to the public.") (citation and quotation marks

omitted). Because it imposes substantial compliance burdens and costs, the Act is akin to a tax

on the press for publishing political speech, something the Supreme Court has never upheld. *See*

*Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 234 (1987); *Simon & Schuster, Inc. v.*

*Members of New York State Crime Victims Bd.,* 502 U.S. 105, 115 (1991) ("A statute is

presumptively inconsistent with the First Amendment if it imposes a financial burden on

speakers because of the content of their speech.").

By imposing substantial compliance burdens on news outlets that publish political speech

without a compelling justification (see below), the Act infringes the freedom of the press.

## 2.  Subsection 7 is not narrowly tailored to a compelling governmental interest.

Restrictions on speech that are "content-based" are subject to strict scrutiny. *Id*. at 506.

"A restriction that targets speech is content-based if it 'applies to particular speech because of the

topic discussed or the idea or message expressed[.]'" *Id*. at 505 (quoting *City of Austin, Tex. v.*

*Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022)). The Act is content-based because

it specifically targets speech about political campaigns. *See Washington Post v. McManus*, 944

F.3d 506, 513 (4th Cir. 2019) (statute that "singles out one particular topic of speech—

campaign-related speech—for regulatory attention" was "a content-based regulation on speech").

"[C]ontent-based laws are 'presumptively unconstitutional.'" *Id.* (quoting *Reed v. Town of*

*Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)). And "content-based regulations that target *political*

speech are especially suspect." *Id*.

Strict scrutiny of content-based regulations of speech requires the government to

demonstrate "a compelling interest and . . . narrow[] tailor[ing] to achieve that interest." *Rideout*

*v. Gardner*, 838 F.3d 65, 70 (1st Cir. 2016) (quotation marks omitted). In particular, "[n]arrow

tailoring in the strict scrutiny context requires the statute to be 'the least restrictive means among available, effective alternatives.'" *Id*. (quoting *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004)).

The problem the Act purports to identify and solve is foreign government-influenced entities spending money to influence Maine elections. The Media Plaintiffs take no position on whether there is a compelling governmental interest in banning spending by foreign government-influenced entities to influence Maine elections.[1] But if there is, there are more tailored and less restrictive ways to address the issue. One option would be to impose disclosure obligations on advertisers, requiring them to affirmatively disclose the extent of foreign government ownership or participation in their decision-making. Another option would be to ban such expenditures as the Act does, but penalize just the advertisers, not the news outlets. Or political advertisers could be required to file with the State a certification attesting that they are not foreign government-influenced and to make that certification available to news outlets. Or advertisers could be required to certify directly to news outlets that they are not foreign government-influenced. These approaches would be less restrictive in that they would impose less of a burden on news outlets and would not substantially delay the running of political ads, as the due diligence process required by subsection 7 often would. Spencer Decl. ¶ 14; Jalbert Decl. ¶ 13; *see In re Perry*, 859 F.2d 1043, 1047 (1st Cir. 1988) ("Without question, the right to free speech includes the right to timely speech on matters of current importance."). The Media Plaintiffs do not endorse these alternatives, and take no position at this time on whether they would be constitutional, but offer them here as examples of less restrictive means the State could employ to achieve its objectives.

---

[1] This is an unsettled question. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 362 (2010).

If the State believes its interest in preventing foreign government-influenced entities from spending money in Maine elections is so compelling that investigation, not just self-certification, is necessary, the government could achieve that objective in a way that is less restrictive of the Media Plaintiffs' First Amendment rights by simply doing that investigative work itself.[2] As a practical matter this would be a much better way to achieve the Act's objectives, as the State—unlike news outlets, many of which are very small operations—has investigators and attorneys who may know how to conduct the sort of work the Act appears to require. Having the State do the investigating would also avoid the inconsistent interpretation and application of the Act that would inevitably ensue if hundreds of Maine news outlets with varying resources were each to conduct their own investigation. The impact of the Act if investigation and enforcement activities were undertaken by each individual news outlets would be both overbroad (because some domestic entities would be prevented from or delayed in engaging in political speech because a news outlet could not ensure that they were not foreign government-influenced) and underinclusive (because some foreign government-influenced entities would inevitably slip through the rather large cracks in any plausible vetting process news outlets could establish). It would be far less restrictive of First Amendment activities for the State to do (and pay for) this investigative work itself, rather than commandeering under-resourced and unqualified news outlets to do it for them. The outsourcing to news organizations of the job of investigating whether advertisers are violating the Act is not the least restrictive way of dealing with the issue of foreign government-influenced campaign expenditures. Nor is it narrowly tailored.

Another way to see why subsection 7 unconstitutionally burdens protected speech is to consider whether the State could do itself what subsection 7 enlists news outlets to do on the

---

[2] The Media Plaintiffs would have First Amendment concerns with this approach, but it would be less burdensome than forcing news outlets to undertake such investigations.

State's behalf. If the Act banned political ads that had not first been screened *by the State* for foreign government influence, a successful action by the State for an injunction to enforce that ban would amount to an unconstitutional prior restraint on speech. *See Alexander v. United States*, 509 U.S. 544, 550 (1993) ("The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.") (alterations and quotation marks omitted). When a "prior restraint impinges upon the right of the press to communicate news and involves expression in the form of pure speech—speech not connected with any conduct—the presumption of unconstitutionality is virtually insurmountable." *Matter of Providence J. Co.,* 820 F.2d 1342, 1348 (1st Cir. 1986), *opinion modified on reh'g*, 820 F.2d 1354 (1st Cir. 1987). The government bears the "heavy burden of showing justification for the imposition of such a restraint," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976), which must survive "the most exacting scrutiny demanded by our First Amendment jurisprudence." *Sindi v. El-Moslimany*, 896 F.3d 1, 32 (1st Cir. 2018).

The Act amounts to a prior restraint because it requires news outlets to screen and censor speech in advance of its publication, something the State itself could not constitutionally do. *See Auburn Police Union v. Carpenter*, 8 F.3d 886, 903 (1st Cir. 1993) ("A prior restraint is a government regulation that limits or conditions in advance the exercise of protected First Amendment activity," and a limitation on political speech imposed by the government may be found unconstitutional unless it is "narrowly tailored, based upon a continuing course of repetitive speech, and granted only after a final adjudication on the merits that the speech is unprotected . . . ."). "[W]hen the onus is placed on platforms, we hazard giving government the ability to accomplish indirectly via market manipulation what it cannot do through direct

10

regulation—control the available channels for political discussion." *McManus*, 944 F.3d at 517; *see also Lafortune v. City of Biddeford*, No. 01-250-P-H, 2002 WL 823678, at *8 (D. Me. Apr. 30, 2002), *report and recommendation adopted*, 222 F.R.D. 218 (D. Me. 2004) ("Requiring a written release from every person who is not a 'public official' whose name may be mentioned during the broadcast of a local-access television program . . . imposed an unconstitutional prior restraint on the plaintiff's freedom of speech, by giving private individuals the effective power of censorship."). Subsection 7 contains none of the procedural safeguards the First Amendment requires before speech may be restricted in advance of its utterance. *See Freedman v. State of Md.*, 380 U.S. 51, 58 (1965) (statutory censorship regime "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system"); *Vance v. Universal Amusement Co.*, 445 U.S. 308, 317 (1980) (nuisance statutes could not be enforced against film exhibitors without "special safeguards"). The Act's due diligence scheme has no procedural safeguards to ensure that protected speech is not inadvertently banned. Instead, news outlets that have neither the training nor the expertise to do so are required to make *ad hoc* determinations about whether an advertiser is foreign government-influenced.

Delegating to news outlets the power to ban political speech in advance of its publication, with neither clear standards nor procedural safeguards to govern their exercise of that power, cannot possibly be the least restrictive way to advance any compelling interest the State may have in regulating political advertising by foreign government-influenced entities. Imposing a prior restraint on speech is not a narrowly tailored solution to the problem the Act identifies. It is less restrictive to punish a specific utterance that is found after the fact to have been illegal than to impose more general restraints on speech in advance of its being uttered.

It is also a problem for the narrow tailoring analysis that the Act is doomed to do little to address the problem it purports to solve. Foreign actors are well known to use social media sites like Facebook, Tik Tok, Twitter, and Instagram to influence American politics, but those platforms cannot be regulated by Maine pursuant to Section 230(c) of the Communications Decency Act of 1996. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 233 (7th Cir. 2015) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.") (quoting 47 U.S.C. § 230(c)(1)). And the Act contains numerous other loopholes. What about books, billboards, signs, leaflets, parades, speeches, mass gatherings, or other expressive activities by foreign-government influenced entities? If Maine has a compelling interest in shutting down political speech by such entities, it would presumably need to regulate these activities too.

The Media Plaintiffs are unaware of any law anywhere that imposes open-ended and onerous due diligence obligations on news organizations likes the ones subsection 7 appears to create. That is not "conclusive" of the Act's constitutionality, but practices in other jurisdictions are "probative of the weight to be assigned [to Maine's] asserted interests and the extent to which the prohibition in question is necessary to further them." *Butterworth v. Smith*, 494 U.S. 624, 635 (1990). An instructive comparison is to 47 U.S.C. § 317, which imposes a sponsorship disclosure obligation on broadcasters (not print media or websites). The statute "requires radio broadcasters to announce who 'paid for or furnished' a sponsored program at the time of the program," and that "'[t]he licensee of each radio station . . . exercise reasonable diligence to obtain *from its employees, and from other persons with whom it deals directly* in connection with any program or program matter for broadcast, information to enable such licensee to make the announcement

required by this section." *Nat'l Ass'n of Broadcasters v. Fed. Commc'ns Comm'n*, 39 F.4th 817,

818–19 (D.C. Cir. 2022) (quoting 47 U.S.C. §§ 317(a), (c)) (emphasis added).

Under section 317(c) the FCC sought to require that broadcasters tell program sponsors

who lease airtime from the station about the disclosure requirement; ask the sponsor whether

they are a foreign governmental entity or an agent of one; and then "[i]ndependently confirm the

sponsor's status . . . by checking the Department of Justice's Foreign Agents Registration Act

website and the FCC's U.S.-based foreign media outlets reports" and "[d]ocument those

inquiries and investigations." *Nat'l Ass'n of Broadcasters*, 39 F.4th at 819. The D.C. Circuit did

not reach the broadcasters' First Amendment challenge to the "independently confirm the

sponsor's status" requirement, because it found that the statute only required a broadcaster to

obtain information "from its employees, and from other persons with whom it deals directly,"

and that an FCC rule requiring broadcasters to "independently confirm the sponsor's status" by

checking the DOJ website was not authorized by the statute. *Id*. at 819–20. While the court did

not reach the First Amendment issue, the point for present purposes is that the "exercise

reasonable diligence" requirement—to check a federal website and an FCC report and to

document having done so—is far more specific and less onerous than the "due diligence policies,

procedures and controls" requirement here. *See, e.g.*, *Nat'l Org. for Marriage v. Daluz*, 654 F.3d

115, 118 (1st Cir. 2011) (upholding disclosure requirements that "impose no great burden on the

exercise of election-related speech," because "[a]ll that is required is the completion of a one-

page form, which can be filled out and submitted . . . online.").

Another reason subsection 7 is not narrowly tailored to a compelling governmental

interest is the likelihood that it would have a substantial chilling effect on political speech.

"Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—

[b]ecause First Amendment freedoms need breathing space to survive." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021) (quotation marks omitted). In an earlier decision interpreting the statute at issue in *National Association of Broadcasters* the D.C. Circuit raised questions about the constitutionality of saddling news organizations with even the much narrower and less burdensome requirement at issue there based on its potential chilling effect. In *Loveday v. F.C.C.*, 707 F.2d 1443 (D.C. Cir. 1983), the Court agreed with the FCC, based on the language of the statute, its legislative history, and deference to the agency, that the phrase "exercise reasonable diligence" did not require "the exertion of every effort by licensees to identify the real sponsors of paid material that is broadcast." *Id*. at 1448–49. But the court also noted the potential constitutional problems with requiring a more comprehensive investigation:

> [W]e have grave doubts that the Commission could, in circumstances like these, require more of the licensees than it did in this case. A duty to undertake an arduous investigation ought not casually be assigned to broadcasters. A variety of considerations, ranging from practical ones of administrative feasibility to legal ones involving constitutional difficulties, support that view.

*Id*. at 1449.

The court explained that requiring the broadcasters to conduct a full-scale investigation, as subsection 7 appears to require here, "would be to create an administrative quagmire, to establish standards so variable as to invite abuse, and to raise possible constitutional questions." *Id*. at 1457. One problem with requiring news outlets to do the government's investigative and enforcement work for it is that news outlets "are not grand juries," and "[h]ave no power to subpoena documents or to compel the attendance of witnesses." *Id*. And even if the subjects of the investigation voluntarily cooperated, "the result would be to judicialize the process of being allowed to utter a political statement." *Id*. In the absence of cooperation, "the alternative would be a field investigation by agents of the stations, involving requests for documents and

interviews and, perhaps, observation of suspected persons." *Id*. "[T]he burden, expense, and delay would be considerable and in many cases possibly prohibitive." *Id*. The upshot, the D.C. Circuit observed, would be "to turn broadcasters into private detectives." *Id*. "Equally problematic," the Court noted, would be "the question of fairness to the [broadcasters], who would have to guess in every situation what the Commission would later find to be 'reasonable diligence.'" *Id*. (also noting "the opportunities for abuse that such a variable and unknown standard would present should some future Commission use its powers for political purposes.").

In the face of these uncertain but seemingly extensive obligations, the D.C Circuit declared, "the most likely result would be that many stations, in lieu of incurring the expense of the investigation and the risk that the Commission would later assess their duties differently, would try . . . to avoid carrying advertisements of the type involved here." *Id*. at 1458. That is exactly what may happen if enforcement of subsection 7 is not enjoined. *See* Jalbert Dec. ¶¶ 12; Meyer Decl. ¶ 33; Moore Decl. ¶ 30; Spencer Decl. ¶ 34. Stating the obvious, the court concluded that it was "not prepared to say that the public would be benefited from a decline in the number and variety of political messages it receives." *Loveday*, 707 F.2d at 1458.

*Loveday* was not decided on First Amendment grounds, but the concerns the Court expressed have direct relevance here. The FCC has recognized as much, stating in a post-*Loveday* decision that in order to "balance the 'reasonable diligence' obligations of broadcasters in identifying the sponsor of an advertisement with the sensitive First Amendment interests present," unless a broadcaster is "furnished with credible, unrefuted evidence that a sponsor is acting at the direction of a third party, the broadcaster may rely on the plausible assurances of the person(s) paying for the time that they are the true sponsor." 29 FCC Rcd. 10427 (2014) (citing *Loveday*, 707 F.2d at 1459). The free speech concerns are even stronger here given that the Act

15

covers the press and the internet, not over-the-air broadcasting where available frequencies (and thus platforms) are limited.[3]

The concerns the D.C. Circuit articulated in *Loveday* about the chilling effect of making the news media a law enforcement arm of the government resurface in *Washington Post v. McManus*, 944 F.3d 506 (4th Cir. 2019). A Maryland statute required "online platforms" to post certain information about political ads they run (the identity of individuals exercising control over the advertiser and the amount paid) and to retain records that the state could review on request.[4] *Id*. at 511–12. The Court observed:

> Maryland's law is different in kind from customary campaign finance regulations because the Act burdens platforms rather than political actors. So when "People for Jennifer Smith" want to place an online campaign advertisement with the *Carroll County Times*, it is the *County Times* that has to shoulder the bulk of the disclosure and recordkeeping obligations created by the sections of the Act challenged here.

*Id*. at 515. The same is true here: subsection 7 makes news outlets responsible for investigating and enforcing the law against campaign spending by foreign-government influenced entities. As the Fourth Circuit noted, "'[t]he platform-oriented structure poses First Amendment problems of its own." *Id*. In particular, a law that imposes burdens on news outlets "makes certain political speech more expensive to host than other speech because compliance costs attach to the former

---

[3] *See McManus*, 944 F.3d at 519 ("[B]ecause broadcast licensees are given a federal grant to operate one of these limited channels, the Court has given the government wider latitude in regulating what is said on them. This justification, however, is inapposite for the virtually limitless canvas of the internet.") (citation omitted); *see also Reno v. Am. C. L. Union*, 521 U.S. 844, 868–69 (1997) ("[T]he vast democratic forums of the Internet [have never] been subject to the type of government supervision and regulation that has attended the broadcast industry.").

[4] The central First Amendment problem in *McManus* was that the statute compelled political speech. *See* 944 F.3d at 514–15 ("Time and again, the Supreme Court has made clear that it makes little difference for First Amendment purposes whether the government acts as censor or conductor," because "the freedom of speech includes both the right to speak freely and the right to refrain from speaking at all.") (quoting *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps. Council 31*, 138 S. Ct. 2448, 2463 (2018)). Subsection 7 also compels political speech when it requires that, upon discovering a violation of the Act, an "Internet platform shall immediately remove the communication *and notify the commission*." Subsection 7 is unconstitutional for this additional reason.

and not to the latter." *Id*. at 516. "Accordingly, when election related political speech brings in less cash or carries more obligations than all the other advertising options, there is much less reason for platforms to host such speech." *Id*.

The news outlets in *McManus* argued that to comply with the statute's disclosure and record-keeping requirements "they would have to acquire new software for data collection; publish additional web pages; and disclose proprietary pricing models." 944 F.3d at 516. The Fourth Circuit reasoned that "platform-based campaign finance regulations create freestanding legal liabilities and compliance burdens that independently deter hosting political speech," and that, "[f]aced with this headache, there is good reason to suspect many platforms would simply conclude: Why bother?" [5] *Id*.; *see* Jalbert Dec. ¶¶ 12; Meyer Decl. ¶ 33; Moore Decl. ¶ 30; Spencer Decl. ¶ 34. *See also Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 257 (1974) ("Faced with the penalties that would accrue to any newspaper that published news or commentary arguably within the reach of the right-of-access statute, editors might well conclude that the safe course is to avoid controversy," in which case "political and electoral coverage would be blunted or reduced.").

The burden subsection 7 imposes on news outlets—and thus the chilling effect on political speech—would be far greater than in *McManus*. It is bad enough for news organizations to have to "acquire new software for data collection; publish additional web pages; and disclose proprietary pricing models" (944 F.3d at 516)—but it would be exponentially worse to require them to conduct global investigations to attempt to ensure that every entity that owns as little as five percent of a prospective political advertiser—or even just "indirectly participates in the

---

[5] Campaign finance rules imposed on direct participants in the political process, as opposed to news outlets, have less of a deterrent effect, the court explained, because "[p]olitical groups, by design, have an organic desire to succeed at the ballot box. And this ambition generally offsets, at least in part, whatever burdens are posed" by campaign finance laws. *McManus*, 944 F.3d at 516.

decision-making process" of a prospective advertiser—cannot be traced back to a foreign government. Unless an advertiser wears its foreign government ownership on its sleeve, this would be a massive undertaking. The legal liability and compliance "headache" identified by the court in *McManus* would be far more severe here.

Whether or not there is a compelling governmental interest in banning spending by foreign government-influenced entities to influence Maine elections, the Act may be unconstitutionally overbroad in that Maine sets a very low threshold for when an entity is deemed to be "foreign government-influenced." *See Hightower v. City of Bos.*, 693 F.3d 61, 81 (1st Cir. 2012) ("[A] law may be invalidated under the First Amendment as overbroad if a substantial number of its applications are unconstitutional . . . .") (quotation marks omitted). If the Act's prohibitions on political advertising are found to be unconstitutional, then requiring news outlets to enforce those prohibitions would be unconstitutional for the same reasons.

In sum, subsection 7 is a content-based restriction on political speech that is not narrowly tailored or the least restrictive means of achieving a compelling governmental interest. It is therefore unconstitutional.

**C.  Subsection 7 imposes an unconstitutional prior restraint.**

The requirement in subsection 7 that a news outlet "immediately remove" any political ad that it "discovers" is in violation of the Act should be struck down for the additional reason that requiring the immediate removal of political speech from the public sphere without due process or procedural safeguards imposes an unconstitutional prior restraint. *See Matter of Providence J. Co.*, 820 F.2d at 1348 (When a "prior restraint impinges upon the right of the press to communicate news and involves expression in the form of pure speech—speech not connected with any conduct—the presumption of unconstitutionality is virtually insurmountable.");

*Freedman*, 380 U.S. at 58 (a prior restraint "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system"). Subsection 7 is an unconstitutional prior restraint because it imposes a categorical ban on political speech by certain advertisers in advance of their speaking and requires news outlets to "immediately remove" political speech upon discovery without any procedural safeguards.

**D.      Subsection 8 is unconstitutional because it imposes liability without fault.**

Even if the Act were otherwise constitutional, the enforcement mechanism in subsection 8, which subjects news outlets to fines for violating the Act without any requirement that the conduct be intentional or even negligent, is not. Under the First Amendment, news outlets cannot be subject to liability without fault. In *Smith v. People of the State of California*, the Supreme Court struck down an ordinance banning the sale of obscene books, reasoning that:

> By dispensing with any requirement of knowledge of the contents of the book on the part of the seller, the ordinance tends to impose a severe limitation on the public's access to constitutionally protected matter. For if the bookseller is criminally liable without knowledge of the contents, and the ordinance fulfills its purpose, he will tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature.

361 U.S. 147, 153 (1959) (footnote omitted). The same problem exists here: if news outlets are subject to penalties for running an ad that violates the Act without any requirement that they knew the advertiser was foreign government-influenced (which subsection 8 does not require), prudent news outlets may decide to limit the political ads they run to the point that some ads that would have been permitted under the Act are censored. *See Am. Patriot Express v. City of Glens Falls*, 474 F. Supp. 3d 508, 539 (N.D.N.Y. 2020) ("[A] knowledge requirement is necessary for any sanctions provision that might chill speech."); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 613 (6th Cir. 2005) (ordinance violated the First Amendment "by

19

holding participants in a march . . . strictly liable if the march proceeds without a permit" even if they did not know about the need for a permit.); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) ("[W]e believe any statute that chills the exercise of First Amendment rights must contain a knowledge element."). Subsection 8 violates the First Amendment because it holds news outlets liable for violating the Act even inadvertently, without any degree of fault, which would unconstitutionally chill protected political speech.

## II.       The Other Preliminary Injunction Factors Support Granting the Motion.

The irreparable harm requirement is met because the Media Plaintiffs are likely to succeed on the merits, and "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10–11 (1st Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "Accordingly, irreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim." *Id*. at 11. The Media Plaintiffs will be irreparably injured if they are subjected to an unconstitutional statute that, as explained above, violates their First Amendment rights and chills protected speech.

The balance of harms factor also supports injunctive relief. Any harm to the State if it is prevented from requiring the Media Plaintiffs to investigate and enforce the Act's restrictions on political advertising would be minimal, as the State is free to engage in its own investigation and enforcement. And the public interest favors injunctive relief because First Amendment protections for political speech exist to benefit not just news outlets, but the public generally.

## CONCLUSION

Because the requirements for a preliminary injunction are met, the motion should be granted.

Dated at Portland, Maine this 12th day of December, 2023.

Respectfully Submitted,
MAINE PRESS ASSOCIATION AND
MAINE ASSOCIATION OF
BROADCASTERS

by their attorneys,
PRETI FLAHERTY BELIVEAU &
PACHIOS, LLP

*/s/ Sigmund D. Schutz*
Sigmund D. Schutz
Benjamin S. Piper
Jonathan G. Mermin
Alexandra A. Harriman
One City Center
P. O. Box 9546
Portland, ME  04112-9546
(207) 791-3000
sschutz@preti.com
bpiper@preti.com
jmermin@preti.com
aharriman@preti.com

21245724.1