EXHIBIT

**A**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **MAINE PRESS ASSOCIATION**<br><br>**and**<br><br>**MAINE ASSOCIATION OF**<br>**BROADCASTERS,**<br><br>             **Plaintiffs,**<br><br>**v.**<br><br>**MAINE COMMISSION ON**<br>**GOVERNMENTAL ETHICS AND**<br>**ELECTION PRACTICES, et al.**<br><br>             **Defendants.** | Civil Action No. _____ |

### DECLARATION OF JODY JALBERT IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746, I Jody Jalbert, declare and state as follows:

1.  I am the Publisher of the Sun Journal, Advertiser Democrat, Bethel Citizen, Franklin Journal, Livermore Falls Advertiser, Rumford Falls Times and The Rangeley Highlander and Vice President of Advertising for the Sun Journal, Kennebec Journal, Morning Sentinel.

2.  The Sun Journal is a daily newspaper serving Androscoggin, Franklin and Oxford Counties. The Kennebec Journal is a daily newspaper serving Augusta and the capitol region in Kennebec County, the Morning Sentinel is a daily newspaper serving Waterville and northern Kennebec county. The six weekly publications are: The Advertiser Democrat serving the Oxford Hills community of Oxford county, the Bethel Citizen serving the towns of Bethel, Newry, Woodstock and West Paris, the Franklin Journal serving southern Franklin county, the

Livermore Falls Advertiser serving the towns of Livermore, Livermore Falls and Jay, the Rumford Falls Times serving Rumford, Mexico, Dixfield and surrounding towns in the River Valley community of Oxford county and The Rangeley Highlander serving Rangeley, Oquossoc and surrounding towns.

3.      With over 35 years of Maine newspaper experience I also serve as second vice president on the executive board of the Maine Press Association.

4.      I respectfully submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order/Preliminary Injunction.  I describe my objections to the portion of An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution (the "**Act**") applicable to Maine newspaper publishers including our websites.

5.      The MPA Board voted to adopt a policy opposing LD 1610.  The Board agreed, "MPA believes that Section 7 unconstitutionally restricts and burdens speech about public issues. Newspapers are struggling enterprises and are in no position to take responsibility for enforcing this vaguely worded and unreasonably burdensome statute."

6.      We print newspaper and as a result, we would be subject to Section 7 of the Act labeled "due diligence required".

7.      We operate a website at www.sunjournal.com that has on average in excess of 546,000 unique visitors per month. This website appears to be subject to the requirements imposed on "Internet Platforms" under Section 7 of the Act.

8.      The Sun Journal and the six weekly publications publish paid content, in print and online, from both individuals and businesses advertising products and services as well as from political, advocacy and non-profit organizations and entities communicating views about the

2

issues important to the communities we serve, including nomination or election of a candidate or the initiation or approval of a referendum.

9.      I am concerned that Section 7 of the Act singles out news outlets, including the Sun Journal, Advertiser Democrat, Bethel Citizen, Franklin Journal, Livermore Falls Advertiser, Rumford Falls Times and The Rangeley Highlander and that it (A) imposes vague and ambiguous standards making it impossible for us to know what we are legally allowed to do; (B) requires us to institute burdensome due diligence requirements that will cause us to delay or not run at all some significant number of truthful political ads that we would have published in the past; (C) that we are required to remove truthful political speech that in our judgment our audience should be able to see/hear.

**Vague and Confusing Standards**

10.      The provisions of Section 7 of the Act are unclear and confusing.  I do not know what "due diligence policies, procedures and controls" are meant to require, so even if the Sun Journal and its six sister weekly publications had the resources, which we do not, to investigate who owns prospective advertisers, we would have no way of knowing whether the measures we have adopted are sufficient to comply with the statute. What "due diligence policies" would be required to comply with the Act?  I am unaware of any relevant policy that we might look to as a model. I do not know and believe that no one knows what "procedures" are meant to be in this context. I also do not know what "controls" means here.

11.      The "reasonably designed to ensure" standard is also vague.  The statute does not say who decides what is "reasonable" or how that would be measured. It puts us at risk of being second-guessed later when someone will decide what was "reasonable" after-the-fact.

3

12.     This ambiguity is a problem because we do not know what we are required to do to comply with the Act. To avoid legal risk, I expect that if we cannot tell if an advertiser qualifies as a "foreign government-influenced entity" we may not accept its advertisements.  I expect that we will end refusing to publish some number of political advertisements by advertisers that actually comply with the Act.

13.     Because of ambiguity in the Act and its burdensome due diligence requirements, I also expect that we will delay accepting and publishing some political speech. Advertisers often ask us to print and post advertisements immediately or very soon after they pay for an advertisement. We are often asked to get an advertisement online immediately or to publish as soon as possible. Any serious due diligence requirement would be time consuming and would end up delaying publication of some advertisements while we attempt to determine whether the advertiser complies with the Act. A delay in running an ad in a weekly newspaper could mean a two-week delay in publication.

**Due Diligence Policies, Procedures and Controls**

14.     Our current advertising workflow does not include due diligence policies, procedures and controls to identify "foreign government-influenced entities." To develop due diligence policies, procedures and controls reasonably designed to ensure that we do not distribute, or otherwise make available to the public a communication for which a foreign government influenced entity has made an expenditure—as required by the Act—would require that the Sun Journal and its six sister weekly publications either divert current resources or hire new staff to manage this new burden.

15.     This type of investigative work to attempt to screen out certain types of advertisers would impose a significant administrative burden and strain already limited

4

resources. The research necessary to determine ownership of any entity placing an ad in relation to an election would be time consuming and require skills not currently necessary for our advertising staff. The resources needed to develop, train to and maintain such processes would require investment and divert resources from our news collecting operation and would be off balance from the revenue generated in our weekly publications where the average rate per inch is $9.50.

16.     News media organizations have struggled financially as a result of changes in our industry, including decline in print subscriptions and shift to digital advertising, which generally produces less overall revenue than traditional print advertisements. These financial hardships have affected our organization and the administrative burdens imposed by the Act impose considerable additional burdens on us when we are already very strained.  The Act forces us to re-direct resources from our editorial and news reporting functions to perform government mandated due diligence that has the additional downside of forcing us to screen out a source of revenue (paid advertisements) that supports our newsrooms.

17.     To the best of my knowledge there is no list of "foreign government-influenced entities." We would not be able to effectively determine whether many entities fall within that definition.

18.     To the best of my knowledge, there is no way for us to reasonably identify many and likely most "foreign government influenced entities." If an entity self-identifies as a foreign government, that much would be obvious. A few entities that have engaged in political speech in Maine are well-known to be owned in part by foreign governments. But the term "foreign government-influenced entities" (as defined by the Act) also includes several other categories of entities that we would have no practical way to identify.

21242070.1

19.     To my understanding, "foreign government influenced entities" (as defined by the Act) includes, "a firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity . . . [h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests[.]" To reasonably insure that we identify every entity that qualifies under this standard and screen out any political advertising they ask us to print or make available to the public on our website would be a very substantial undertaking. Often ads are ordered through an advertising agency and the turnaround from order received to publication can be under 12 hours. Advertising agencies do not share the ownership structure of the entity placing the advertisement. Agencies more than likely do not have information in the detail necessary to determine percentage of ownership or control.

20.     There is no practical way for our advertising staff to identify "foreign government-influenced entities" and to even attempt to identify would require lengthy, substantial, and costly research that most advertising staff is not qualified to do.

21.     I am also concerned that the due diligence requirements would be burdensome on us but could be easily evaded.  Entities willing to violate the Act could easily hide ownership using shell entities, making it impossible for us to find out whether the entity is subject to the Act's prohibitions.

**Objection to Government Censorship**

22.     We have a proud heritage of exercising independent editorial judgment regarding the news, opinion, and advertising content we publish. Throughout our history, the Sun Journal, Advertiser Democrat, Bethel Citizen, Franklin Journal, Livermore Falls Advertiser, Rumford

6

21242070.1

Falls Times and The Rangeley Highlander have exercised independent editorial judgment about the political speech we publish, including paid advertisements. We routinely decide not to publish material that in our judgment does not belong in the pages of our newspaper or on our website. We regularly refuse to run advertisements including known inaccuracies or those that appear to aim to mislead or sway decisions with deceptive messaging. We guard this independence vigorously and believe that maintaining our freedom to publish is an integral part of the service we provide our readers.

23.     To my understanding section 7 of the Act requires that if we discover that a public communication has been published on our website in violation of the Act we "shall immediately remove the communication" and notify a state government agency even if the content otherwise is accurate and meets our editorial standards.

24.     The Sun Journal and it's six sister weekly newspapers strongly object to government telling us that we cannot publish truthful political advertisements of a type that we have published for many years. Separate and apart from whatever rights our advertisers themselves may have, we believe that we have our own independent rights as operators of print newspapers to decide what we publish and that those rights are protected by the First Amendment.

25.     Because of the substantial compliance burdens, potential liability, and precedent that would be set by acceding to a government regulation of our political advertising content, we would have to reexamine whether to accept political advertising. We would not take such a decision lightly. The loss of political advertising would have a meaningful financial impact on us and would almost certainly reduce the resources available to our newsroom and supporting

21242070.1

departments and would be a significant detriment to our organization and the communities which we serve.

**Our Mission**

26.     The loss of political advertising would be a loss to our readers and would undermine our mission. Political discourse is central to our mission. We are one of the primary forums for discussion of local candidates and political issues in Maine, including referenda. In our view, our newspapers dedicate a considerable amount of space for the objective consideration of local candidates, political issues, referenda issues and ballot questions. An informed community must be presented with both sides of an issue and hear all points of view. Often support for one side or the other is in the form of advertising.

27.     The loss of the political speech banned by the Act would, in my view, undermine the democratic process in the communities we serve.

28.     For the reasons explained above, I respectfully urge the Court to enjoin enforcement of section 7 of the Act.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of December, 2023.

Signed: _/s/ Jody Jalbert_____

Printed Name___Jody Jalbert_____

21242070.1