EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **MAINE PRESS ASSOCIATION** ) <br> ) <br> **and** ) <br> ) <br> **MAINE ASSOCIATION OF** ) <br> **BROADCASTERS,** ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> **v.** ) <br> ) <br> **MAINE COMMISSION ON** ) <br> **GOVERNMENTAL ETHICS AND** ) <br> **ELECTION PRACTICES, et al.** ) <br> ) <br> **Defendants.** ) | Civil Action No. _____ |

**DECLARATION OF JUDITH MEYER IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746, I, Judith Meyer, declare and state as follows:

1. I am the executive editor of the Sun Journal in Lewiston, the Kennebec Journal in Augusta and the Morning Sentinel in Waterville, along with six weekly newspapers in western Maine, all of which are active members of the Maine Press Association.

2. The Maine Press Association, founded in 1864, is one of the oldest professional news organizations in the nation. Our goals, as spelled out in our charter and by-laws, are to promote and foster high ethical standards and the best interests of the newspapers, journalists, and media organizations of the state of Maine that constitute its membership; to encourage improved business and editorial practices and better media environment in the state; and to improve the conditions of journalism and journalists by promoting and protecting the principles of freedom of speech and of the press and the public's right to know.

3. I currently serve on the Legislative Committee of the Maine Press Association. I also represent member publishers of the Maine Press Association on the Right to Know Advisory Committee, created to serve as a resource and advisor to the Maine Legislature on the state's Freedom of Access laws, and to provide recommendations to the Governor, the Legislature, the Chief Justice of the Supreme Judicial Court and local and governmental entities with regard to best practices in providing the public access to records and proceedings and maintaining the integrity of Maine's Freedom of Access laws.

4. I respectfully submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction. I describe my objections to the portion of *An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution* (the "**Act**") applicable to all members of MPA.

5. MPA members submitted a letter urging Governor Janet Mills to veto L.D. 1610, which became Question 2 on the November 2023 ballot; and the Governor did veto L.D. 1610. A true and accurate copy of her veto letter is attached as **Exhibit 1**.

6. The MPA board voted to adopt a policy opposing LD 1610/Question 2. A true and accurate copy of that policy is attached as **Exhibit 2.**

7. The State of Maine Office of the Secretary of State published a *Citizens Guide to the Referendum Election on November 7, 2023*. The Guide includes the text of L.D. 1610, which became Question 2 on the November ballot. A true and accurate copy of the Guide cover and pages 1-3; 8-17 are attached as **Exhibit 3** (portions of the Guide relevant to the other referenda are excluded).

8. The membership of MPA consists of six daily newspapers, more than 35 weekly newspapers, five digital publications and one student newspaper, all of which publish in Maine for Maine readers, and our members would be subject to Section 7 of the Act and labeled "Due diligence required."

9. Nearly all of our members operate websites complementary to our print publications, while others operate as digital sites only. As a result, our members' websites appear to be subject to the requirements imposed on "Internet platforms" under Section 7 of the Act.

10. Our members publish paid content, in print and online, from both individuals and businesses advertising products and services, as well as from political, advocacy and nonprofit organizations and entities communicating views about the issues of the day, including the nomination or election of a candidate or the initiation or approval of a referendum.

11. I am concerned that Section 7 of the Act singles out news outlets, including members of MPA, and that it (A) imposes vague and ambiguous standards making it impossible for us to know what we are legally allowed to do; (B) appears to require us to institute burdensome due diligence regulations that will cause us to delay or not run at all some significant amount of truthful political speech that we would have published in the past; (C) would force us to remove truthful political speech that in our judgment our readers otherwise should be able to receive. The Act threatens us with substantial financial penalties if we do not comply.

**Vague and Confusing Standards**

12. The provisions of Section 7 of the Act are unclear and confusing. The required "due diligence policies, procedures and controls" are not defined and open to wide interpretation by our members. The Act includes the word "and" referencing "due diligence policies,"

"procedures," "controls." Does that mean that we are required to have all of three of those elements satisfied, or that each of them means something different? Without clear definition and direction, I do not know and believe that no one knows what any of these terms mean in the context of the Act. What "due diligence policies" would be required to comply with the Act? I am unaware of any relevant policy that we might look to as a model. I do not know and believe that no one knows what "procedures" are meant to be in this context, and depending on individual newspapers may mean different procedures in different shops. I also do not know what "controls" means here, or how a single standard measure of "controls" could be implemented across a wide variety of newspapers that operate with varying staff levels and varying understanding of "controls."  I gather that "due diligence policies, procedures and controls" must mean something serious and substantial because they must be "reasonably designed to ensure" (per the Act) that we do not make available to the public a public communication that would violate the Act, but I have no idea what these provisions actually require of MPA members without any definition of these terms in the statute.

13. The "reasonably designed to ensure" standard is also vague and subjective.  The statute does not say who decides what is "reasonable" and puts us at risk of being second-guessed later when someone will decide what was "reasonable" after-the-fact. And what if our members believe that the second guesser is being unreasonable? We have no recourse.

14. Section 7 of the Act applies to "a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement." Does the Act apply to letters to the editor, guest columns, and other types of content for which a foreign government-influenced entity may have made a "disbursement" to someone other than our members in connection with the content? Does the

4

Act apply if we publish on our member op-ed pages a submission by an employee of a foreign government-influenced entity? Does the Act apply even where a "public communication" is part of a news story, even when attribution is given to a press release from that entity? The Act does not answer these questions.

15. This ambiguity is a problem because we do not know what we are required to do to comply with the Act. To avoid legal risk, MPA members may very well end up refusing to accept advertisements because the Act is vague and confusing. I expect that if we cannot tell if an advertiser qualifies as a "foreign government-influenced entity" we may not accept their advertisements. Because of ambiguity in the Act, I expect that we will end up not publishing some number of political advertisements – and it may very well be a high number – that actually comply with the Act.

16. Advertisers often ask MPA members to print advertisements immediately to our websites or very soon after having paid for an advertisement, and our members' print advertising deadlines are often in the late afternoon on the day a publication goes to print. Any serious due diligence activities would be time-consuming and would end up delaying publication of at least some advertisements while we attempt to determine whether the advertiser's ownership complies with the Act. Our readers/audience will not see some advertisements as quickly as would be true but for the Act and some may miss seeing some advertisements altogether. People who read our newspaper one day, may not read the paper the next day.

**Due Diligence Policies, Procedures and Controls**

17. The current advertising workflow for our members does not include due diligence policies, procedures and controls to identify "foreign government-influenced entities." To develop due diligence policies, procedures and controls reasonably designed to ensure that we do

not broadcast, distribute, or otherwise make available to the public a communication for which a foreign government influenced entity has made an expenditure—as required by the Act—would certainly require additional staff. Ads do not arrive in our shops with clear ownership statements, and the penalties outlined in the Act would require our members to research each and every ad that is placed, right down to a one-inch political ad placed in a weekly paper at a cost of $9.50 or less. The time and resources required to vet ownership of such a small ad would far exceed the revenue from that ad, and our members would likely not run the ad, chilling the speech contained therein.

18. This type of detective work to attempt to screen out certain types of advertisers would impose a significant administrative burden and strain already limited resources if we do the work in our own shops, but often political advertising is placed through ad agencies as "camera ready" content for our members' pages and sites. The Act does not require these agencies to research ownership, but would hold our members responsible for performing additional research work to screen multiple pre-built page-ready ads that often come in minutes before deadlines. The Act forces us to divert resources to perform government mandated due diligence to screen out a source of revenue — through paid advertisements — that support our member newsrooms.

19. The Act appears to impose the same research burden on our member newsrooms that accept letters to the editor and guest columns about political candidates and public referendums containing expressions of opinion. If an employee of a foreign-owned corporation who lives and works in Maine, and who has a vested interest in expressing an opinion on a public matter, submits a letter to the editor, would the Act require our member newspapers to reject that letter? Do we have to ask everyone who submits a letter where they are employed? Or

for what organization they may volunteer? The Act forces us to divert resources from our editorial and news reporting functions to perform government mandated due diligence to ensure that no speech that stems from a certain percentage ownership of a foreign government-influenced entity ever makes its way on to any MPA members' printed pages or websites.

20. To the best of my knowledge there is no list of "foreign government-influenced entities." To the best of my knowledge, there is no way for us to reasonably identify many and likely most "foreign government influenced entities." If an entity self-identifies as a foreign government, that much would be obvious. And a few entities that have engaged in political speech in Maine are well known to be owned in part by foreign governments. But the term "foreign government-influenced entities" (as defined by the Act) also includes several other categories of entities that our members would have no practical way to identify without delving into the full ownership of every potential advertiser, every potential letter writer, every potential guest columnist and every potential other contributor of speech.

21. To my understanding, "foreign government influenced entities" (as defined by the Act) includes, "[a] firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity . . . [h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests[.]" To reasonably ensure that our members identify every entity that qualifies under this standard and screen out any political advertising they ask us to publish in print or online would be a very substantial undertaking.

22. For example, annual reports for corporations authorized to operate in Maine do not reveal ownership shares, and while we could certainly call the registered agent for any

corporation or other entity that wished to place an ad or had an employee who cared to submit a letter to the editor, there is no requirement for that agent to reveal ownership shares or to confirm employment or, frankly, no requirement even to talk with our members. Tracing ownership of publicly owned companies can be time-consuming, particularly in detailing percentage ownership, and tracing ownership of privately held entities is even more challenging, as their owners often construct elaborate structures designed to shield the identities of their owners.

23. If the owner, employee or agent of such an entity wanted to place an ad or submit a guest column on a topic of great public interest, without the ability to confirm percentage ownership, our member newspapers would be forced to reject the ad and refuse that column, silencing speech.

24. To my understanding the term "foreign government-influenced entities" (as defined by the Act) also includes "[a] firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity . . . [d]irects, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the firm, partnership, corporation, association, organization or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements." To reasonably ensure that our members identify every entity that qualifies under this standard and screen out any political advertising they ask us to publish would be a substantial undertaking, as explained above.

25. I am also concerned that the due diligence requirements would be burdensome on us but could be easily evaded. And entities willing to violate the Act could easily hide

ownership using shell entities, making it impossible for us to ferret out whether the entity is actually subject to the Act's prohibitions. The Act unfairly holds our members – not the intentional evaders – responsible for any violations.

**Objection to Government Censorship**

26. We have a proud and heritage of exercising independent editorial judgment regarding the news, opinion, and advertising content we publish. Throughout our history, our members have exercised independent editorial judgment about the political speech we publish, including paid advertisements. Our members routinely decide not to publish material that in our judgment is not something we want to publish and those standards of choice vary from publication to publication. We guard this independence vigorously and believe that maintaining our freedom to publish is an integral part of the service we provide to the public.

27. To my understanding section 7 of the Act requires that if we discover that a public communication has been published on our website in violation of the Act we "shall immediately remove the communication" and notify a state government agency even if the content otherwise is accurate and meets our editorial standards. What does that mean? Do we need to take scissors to paper copies? Will we be required to redact our digital editions? Retroactively edit websites?

28. We strongly object to government telling us that we cannot publish truthful political advertisements of a type that we have published for many years. Separate and apart from whatever rights our advertisers themselves may have, we believe that we have our own independent rights as operators of newspapers to decide what we publish and that those rights are protected by the First Amendment. The same holds for submitted opinion content.

29. We strongly object to government imposing due diligence requirements and telling us to immediately remove truthful political advertisements, but exempting other

businesses that make available public communications for which foreign government-influenced entities have made an expenditure, independent expenditure, electioneering communication or disbursement, including persons who engage in political speech using billboards, signs, pamphlets, books, and websites. As for websites in particular, Maine cannot possibly expect to regulate all or any websites (or Internet platforms, whatever that means) around the globe, when so much of our content is picked up and shared through social media channels.

30. If our members reference advertisements or submitted opinion content in political news coverage, that coverage can and is often picked up by wire services and republished in other newspapers and on other websites. The reality is that the Act requires newspapers to research foreign government-influenced entities and weed their influences out of our publications, but someone could drop a sandwich board on the sidewalk in front of our members' doors and "publish" the exact same offending content without restriction or threat of consequences.

31. We strongly object to government dictating to us that we immediately remove truthful political advertisements when we understand that foreign government-influenced entities are able to pay for content intended to influence elections on social media websites like Facebook, Instagram, Tik-Tok, YouTube, and similar online platforms but they are, to my understanding, exempt from complying with the Act because of Section 230 of the Communications Decency Act of 1996 (47 U.S.C. § 230).

32. To my understanding, section 8 of the Act subjects us our members to a penalty of $5,000 or double the amount of the expenditure involved in the violation, whichever is greater, for violating the Act.

33. Because of the substantial compliance burdens, potential liability, and precedent that would be set by acceding to a government regulation of our political advertising content, our members would be forced to reexamine whether to accept political advertising. We would not take such a decision lightly. The loss of political advertising would have a meaningful financial impact on us and would almost certainly reduce the resources available to our newsroom, which is supported by advertising revenue. And it would most surely reduce public access to information about issues important to Maine people.

**Our Mission**

34. The loss of political advertising would be a loss to our readers and would undermine our mission. Political discourse in all forms is central to our mission. Our members are the primary forums for discussion of local candidates and political issues in Maine, including referenda. In our view, an informed electorate should hear all points of view, but the Act would effectively silence some points of view because the speaker is tainted with even a small percentage of foreign government ownership and regardless of whether the foreign government has any influence or role in the advertisement.

35. I expect that the result of the Act would be an increase in one-sided advertising campaigns on important issues in Maine. It would also tilt the balance of opinion we could publish on our pages on these same issues, opinion that by its very nature is intended to influence public decisions. The loss of the political speech barred by the Act would, in my view, undermine the democratic process in the communities we serve.

36. I do not believe the Act's provisions regarding news organizations effectively address the issue of fake social media activity as intended because there are too many loopholes. The Act does not control fake accounts on social media, offshore websites, and nefarious actors

could easily hide their ownership making it impossible for us to distinguish between advertisers that are permitted to publish political speech in Maine and those that are prohibited by the Act from doing so. The same goes for opinion writers who our members welcome to our pages to bolster and also to level public discussion of issues important to our state, and who we may be forced to silence through the requirements placed on us by the Act.

37.  The Act slams the door on accurate speech based on its country of origin, but holds wide open the door to fake speech harmful to the public's understanding of issues important to Maine people.

38.  For the reasons explained above, I respectfully urge the Court to enjoin enforcement of section 7 of the Act.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th date of December, 2023.

Signed:  /s/ Judith Meyer

Printed Name  Judith Meyer

21245903.1