


Janet T. Mills
GOVERNOR

STATE OF MAINE
OFFICE OF THE GOVERNOR
1 STATE HOUSE STATION
AUGUSTA, MAINE
04333-0001

Exhibit 1

July 19, 2023

The 131st Legislature of the State of Maine
State House
Augusta, Maine

Dear Honorable Members of the 131st Legislature:

By the authority vested in me by Article IV, Part Third, Section 2 of the Constitution of the State of Maine, I am hereby vetoing L.D. 1610, *An Act To Prohibit Campaign Spending by Foreign Governments and Promote An Anti-Corruption Amendment to the United States Constitution*.

L.D. 1610 attempts to prohibit businesses and other entities with foreign government "influence" – a term that is poorly defined in the bill – from participating in both candidate elections and the citizen-initiated referendum process through monetary expenditures. On this point, the bill is similar to L.D. 194, *An Act to Prohibit Contributions, Expenditures, and Participation by Foreign Government-owned Entities to Influence Referenda* (130th Legis. 2021), a bill I vetoed last session due to potential Constitutional issues.

My concerns about the Constitutionality of the bill remain. But more broadly, while I strongly support and share the desire to find ways to prevent foreign influence in our elections, the language of the bill is too broad and would likely result in the unintended consequence of effectively silencing legitimate voices, including Maine-based businesses, in debates that would impact their interests.

On top of this concern, L.D. 1610 also attempts to regulate the activities of the press and other media outlets, which I believe runs afoul of the First Amendment and is counter to the longstanding tradition and cornerstone of a free press in America.

### L.D. 1610's Regulation of Political Speech

The core of the bill restricts who may participate in political debate, but the First Amendment provides its strongest protections to such political speech (*Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989)), with the Supreme Court generally rejecting restrictions on speech in political campaigns other than to prevent *quid pro quo* style corruption (*Fed. Election Comm'n v. Cruz*, 132 S. Ct. 1638, 1652 (2022)).



L.D. 1610's proponents point to a Federal District Court decision in *Blumen v. FEC*, 800 F. Supp. 281 (D.D.C. 2012), as support for the constitutionality of the bill's prohibition on expenditures by foreign government-influenced entities. But *Blumen* involved the review of a very different law. At issue in that case was a prohibition only on contributions by *foreign nationals,* whereas this bill would also apply to Maine-based businesses that have, for example, investment from a public pension fund of a foreign city or province that has no interest in influencing a referendum. And importantly, *Blumen* only addressed a prohibition on contributions to candidates, political action committees, and political parties, all of which create the potential for *quid pro quo* corruption. This bill, however, also prohibits expenditures on citizen referenda; but the Supreme Court has explained that the risk of *quid pro quo* corruption "simply is not present in a popular vote on a public issue." *First Nat'l. Bank of Boston v. Bellotti*, 98 S. Ct. 1407, 1423 (1978).

While some states have restrictions on foreign nationals and foreign corporations from participating in ballot initiatives, L.D. 1610 is different from those statutes in ways that are problematic:

1. L.D. 1610 does nothing to prohibit a foreign national from contributing to or making expenditures in a ballot initiative campaign;

2. The definition of a foreign entity as one that has 5 percent investment by a foreign government is so broad that it could theoretically incorporate businesses that are 95 percent owned and operated by citizens of Maine. Moreover, most states that bar foreign entities from contributing to a ballot initiative focus on where the business is incorporated or has its principal place of business. If the entity is a domestic subsidiary of a foreign business, they require United States citizens to determine how to make campaign donations. Here, however, the definition of a "foreign-influenced entity" requires one to know the level of foreign government investment in a privately held or publicly traded business – a much more in depth and difficult question to answer.

3. Under L.D. 1610, the same business that is barred from influencing the electorate as they consider a statute at referendum may retain a paid lobbyist to influence legislators as they consider enacting a statute – an odd and somewhat contradictory distinction to make that, in essence, says lawmakers are due certain information from certain messengers but not the people of Maine.

### L.D. 1610's Regulation of the Press and Media Outlets

Most troubling, however, is that L.D. 1610 attempts to regulate the activities of the press in two primary ways.

First, it requires internet platforms to "immediately remove" communications paid for by a foreign government-influenced entity, which is likely in violation of the First Amendment, and penalizes media outlets if they do not do so. But the Supreme Court has consistently protected the right of the press to carry truthful information of public concern, even when a third party violated the law



in providing that information. *Bartnicki v. Voper*, 532 U.S. 514, 535 (2001). And paid advertising is entitled to the same First Amendment protection as editorial content. *New York Times v. Sullivan,* 376 U.S. 254, 265-66 (1964).

Second, L.D. 1610 also contains a "due diligence" provision that would require media outlets to ensure they do not publish communications "directly or indirectly" paid for – something that is, again, very difficult to discern – by a "foreign government-influenced entity," under threat of significant financial penalties.

The Maine Association of Broadcasters, in urging me to veto this bill, wrote that this provision will "essentially require broadcast outlets to become detective agencies, tasked with investigating the source of funding for any and all campaigns." Similarly, the Maine Press Association wrote that the provision "would restrict and burden speech about public issues in Maine by forcing news outlets to create an oppressive, time-consuming, and costly self-censorship regime." I share these concerns and have enclosed their letters for the Legislature's review and consideration.

### Conclusion

While L.D. 1610 is flawed, I agree that we should, and we can, take a stand against dark money in our elections by reaffirming the Legislature's support for an amendment to the U.S. Constitution, as described in Section 2 of L.D. 1610. And we can find a way to prevent foreign influence in our elections by enacting a more narrowly tailored and easily understood statute. Foreign actors have, and will, attempt to influence elections in America, but in attempting to protect our citizens from such nefarious actors, we should not create a bureaucratic morass that will entrap and silence otherwise legitimate voices and undermine the fundamental American cornerstones of free speech and free press. For the reasons set forth above, I return L.D. 1610 unsigned and vetoed, and I urge the Legislature to sustain this veto.

Sincerely,

*[signature]*

Janet T. Mills
Governor



**PretiFlaherty**

Portland, ME
Augusta, ME
Concord, NH
Boston, MA
Washington, DC

Sigmund D. Schutz
sschutz@preti.com
207.791.3247

July 13, 2023

Governor Janet T. Mills
Office of the Governor
1 State House Station
Augusta, ME  04333-0001

  RE: **LD 1610 - An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution**

Dear Governor Mills:

  The Maine Press Association strongly opposes and urges you to veto LD 1610 because it violates the Article I, Section 4 of the Maine State Constitution[1] and the First Amendment of the United States Constitution[2]. It violates their members' constitutional right to be free from laws "regulating or restraining the freedom of the press" and from freely speaking, writing, and publishing sentiments on any subject. Me. Const. art. I, § 4. Of particular concern to their members—and something that appears to have received scant attention before now—is that LD 1610 would impose a burdensome self-censorship regime on news outlets by requiring the creation of "due diligence procedures, policies, and controls" to screen communications for violations of the political spending limitations imposed by Section 2 of LD 1610. This is enforceable by onerous civil penalties and an obligation to remove any content discovered to violate the legislation. These sections of LD 1610 stand out as they directly impose an onerous censorship mandate directly on news outlets.

---

[1] "**Section 4.  Freedom of speech and publication; libel; truth given in evidence; jury determines law and fact.**  Every citizen may freely speak, write and publish sentiments on any subject, being responsible for the abuse of this liberty; no laws shall be passed regulating or restraining the freedom of the press; and in prosecutions for any publication respecting the official conduct of people in public capacity, or the qualifications of those who are candidates for the suffrages of the people, or where the matter published is proper for public information, the truth thereof may be given in evidence, and in all indictments for libels, the jury, after having received the direction of the court, shall have a right to determine, at their discretion, the law and the fact." Me. Const. art. I, § 4.

[2] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

Preti Flaherty
Beliveau & Pachios LLP
Attorneys at Law

45 Memorial Circle, Augusta, ME 04330  |  PO Box 1058, Augusta, ME 04332-1058  |  Tel 207.623.5300  |  www.preti.com

20730425.2

PRETI FLAHERTY

Governor Janet T. Mills
July 13, 2023
Page 2

It is one thing to burden direct political participants with campaign spending restrictions,[3] but quite another to impose burdensome, vague, and costly compliance requirements that threaten neutral third-party news outlets with penalties and injunctions for publishing political speech.[4] The latter is plainly unconstitutional. The due diligence and penalty provisions of LD 1610 are Sections 7 and 8, as follows:

> **7. Due diligence required.** Each television or radio broadcasting station, provider of cable or satellite television, print news outlet and Internet platform shall establish due diligence policies, procedures and controls that are reasonably designed to ensure that it does not broadcast, distribute or otherwise make available to the public a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement in violation of this section. If an Internet platform discovers that it has distributed a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement in violation of this section, the Internet platform shall immediately remove the communication and notify the commission.
>
> **8. Penalties.** The commission may assess a penalty of not more than $5,000 or double the amount of the contribution, expenditure, independent expenditure, electioneering communication, donation or disbursement involved in the violation, whichever is greater, for a violation of this section. In assessing a penalty under this section, the commission shall consider, among other things, whether the violation was intentional and whether the person that committed the violation attempted to conceal or misrepresent the identity of the relevant foreign government-influenced entity.

This legislation constitutes a prior restraint on speech because it purports to tell news outlets what they can and cannot publish. We are unaware of any legal precedent upholding this kind of prior restraint on publication of political speech by independent news outlets.

---

[3] The MPA does not take a position here about whether election spending restrictions only on "foreign government-influenced entities" (a defined term in LD 1610) may be unconstitutional, but notes that Justice Stevens considered such restrictions to violate the majority's rationale in *Citizens United v. Fed. Election Comm'n*. 558 U.S. 310, 424 (Stevens, J., dissenting) ("If taken seriously, our colleagues' assumption that the identity of a speaker has *no* relevance to the Government's ability to regulate political speech . . . would appear to afford the same protection to multinational corporations controlled by foreigners as to individual Americans: To do otherwise, after all, could "'enhance the relative voice'" of some (*i.e.,* humans) over others (*i.e.,* nonhumans).") The *Citizens United* majority specifically did "not reach the question whether the Government has a compelling interest in preventing foreign individuals or associations from influencing our Nation's political process." *Id.* at 362.

[4] *See Washington Post v. McManus,* 944 F.3d 506, 515 (4th Cir. 2019) (distinguishing between customary campaign finance regulations burdening political actors from "platform-oriented" legislation posing "First Amendment problems of its own" and upholding injunction against Maryland's Online Electioneering Transparency and Accountability Act).

PRETI FLAHERTY

Governor Janet T. Mills
July 13, 2023
Page 3

      We are also unaware of any precedent upholding laws imposing any sort of mandatory "due diligence" process on news outlets before they can publish political speech. LD 1610 would restrict and burden speech about public issues in Maine by forcing news outlets to create an oppressive, time-consuming, and costly self-censorship regime. The "due diligence" process is not something that news outlets can be required to do. And the content limitations imposed by LD 1610 would infringe newspaper's right to editorial control over their published content.[5] Will the government periodically investigate the sufficiency of whatever "due diligence" regime news outlets might adopt? News outlets can only guess at what acceptable due diligence might entail. LD 1610 also has an unconstitutional chilling effect on speech by deterring newspapers from publishing any content that *may* violate the prohibition in LD 1610.[6] None of this comports with the First Amendment.

      The compliance costs associated with LD 1610's mandated "due diligence policies, procedures and controls" itself gives rise to constitutional problems. The expense of compliance "makes certain political speech more expensive to host than other speech because compliance costs attach to the former and not to the latter."[7] This result is to discourage news outlets from accepting political advertisements. This is yet another constitutional problem. LD 1610 would be subject to strict scrutiny constitutional review and would fail such review.

      Although we are writing this letter urging you to veto LD 1610 for the purpose of protecting the freedom of speech and the press, we cannot ignore the implications that it will have on entities with a legitimate interest in the Maine economy and political process. LD 1610 applies to any "foreign government-influenced entity" which is defined as any entity that is just 5% or more owned by any entity that is 50% or more owned or controlled by a foreign government. It appears that an entity that is 95% owned by Maine residents, for example, could still be subject to LD 1610. It also appears that LD 1610 would apply regardless of whether a foreign government-owned entity participates in any decision related to election spending; a purely passive minority ownership stake in a multinational enterprise with a domestic subsidiary operating independently in Maine could be prohibited from participating in the political process in Maine. As an advocate for freedom of speech generally, the MPA would have serious objections to LD 1610 even if all of the requirements targeting news outlets were removed.

---

[5] *Id*. at 258 ("A newspaper is more than a passive receptacle or conduit for news, comment, and advertising.24 The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment.")

[6] *See Miami Herald Pub. Co. v. Tornillo,* 418 U.S. 241, 257 (1974) ("Faced with the penalties that would accrue to any newspaper that published news or commentary arguably within the reach of the right-of-access statute, editors might well conclude that the safe course is to avoid controversy. Therefore, under the operation of the Florida statute, political and electoral coverage would be blunted or reduced.")

[7] *Washington Post v. McManus*, 944 F.3d 506, 516 (4th Cir. 2019).

PRETI FLAHERTY

Governor Janet T. Mills
July 13, 2023
Page 4

  In the 130th Legislature, Governor Mills, you *vetoed* LD 194 – An Act to Prohibit Contributions, Expenditures, and Participation by Foreign Government-owned Entities to Influence Referenda. LD 194, (130th Legis. 2021). Although LD 1610 made some changes, overall, it is even more objectionable because it now imposes a burdensome new censorship regime on news outlets. In that veto letter you recognized the First Amendment problems posed by barring companies from "any form of participation in a referendum is offensive to the democratic process, which depends on a free and unfettered exchange of ideas, information, and opinion." And that limitations on core political speech "are highly suspect as a constitutional matter."

  You ended your LD 194 veto letter by recognizing that the legislation would "deprive voters of information and opinion" from certain companies and that the voters should be able "to sort through competing views as they consider how to cast their vote in any referendum." Our country is built on the pillar of a free speech and press, and LD 1610 attempts to put restrictions on the work of the press in disseminating information to the public. Supporters of this bill might dislike certain companies that lawfully operate in this State, but that is not justification to impose unprecedented—and unconstitutional—burdens on news outlets.

  Please veto LD 1610 to show the people of Maine that you recognize the First Amendment infirmities with this legislation and the unacceptable burdens it would impose on Maine's news outlets. Thank you for your consideration.

            Very truly yours,

            Sigmund D. Schutz, Esq.

SDS:apl
cc: Maine Press Association Legislative Committee
   Jeremy Kennedy, Chief of Staff
   Anne E. Sedlack, Esq.



July 12, 2023

The Honorable Janet T. Mills
Governor of Maine
1 State House Station
Augusta, ME 04333

Dear Governor Mills,

On behalf of Maine broadcasters, this letter formalizes our strong opposition to LD 1610- An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution.

One of the primary functions of the Maine Association of Broadcasters is to be a watchdog regarding proposed legislation that violates the First Amendment or would cause harm to Maine Radio and Television stations, operating 365 days a year in the public interest.

We believe that this bill achieves both negative consequences.

Of particular concern are Sections 7 and 8:

7. "Due diligence required. Each television or radio broadcasting station, provider of cable or satellite television, print news outlet and Internet platform shall establish due diligence policies and controls that are reasonable designed to ensure that it does not broadcast, distribute or otherwise make available to the public a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication, donation or disbursement in violation of this section."

This requirement places an almost impossible burden on Maine broadcasters, operating on fast-turnaround deadlines for placing advertising and often with a skeleton staff. This law would essentially require broadcast outlets to become detective agencies, tasked with investigating the source of funding for any and all campaigns. Most definitely not reasonable and of prohibitive cost. We believe there are also potential violations of the First Amendment with this broad scope of requirement, particularly since several parameters used (such as "electioneering communication" and "independent expenditure") are not expressly defined.

8. "Penalties. The commission may assess a penalty of not more than $5,000 or double the amount of the contribution, expenditure, independent expenditure, electioneering communication, donation or disbursement involved in the violation, whichever is greater, for a violation of this section."

Again, the parameters of defining what constitutes a violation is ambiguous at best—and the penalties are excessive and left up to the discretion of the "commission".

The MAB won't speculate on what motives lay at the heart of this proposed legislation, but our association can definitively promise that Maine broadcasters will suffer significant harm should this become law, a scenario that will surely invite a legal challenge.

On behalf of Maine Television and Radio stations, we ask that you veto this flawed legislation-and thank you in advance for your consideration.

Sincerely

Tim Moore
President/CEO
Maine Association of Broadcasters


cc: Tim Feely-Deputy Legal Council
    Tom Abello-Legislative Director
    David Abel-Hearst Television, Board Chair MAB
    Corey Garrison-Bennett Radio Group, MAB Board
    Jeff Pierce-Wreaths Across America, MAB Board
    Paul Dupuis- Stony Creek Broadcasting, MAB Board
    Herb Ivy-Townsquare Media, MAB Board
    Kim Lee, Gray Television, MAB Board
    Stan Bennett, Bennett Radio Group, MAB Board
    Kelly Landeen, Gray Television, MAB Board
    Matt Barnard, Portland Radio Group, MAB Board