MPA
MAINE PRESS ASSOCIATION
On the record since 1864

The Maine Press Association, representing 48 newspapers and digital news outlets across the state, is alarmed by the implications of Section 7 in the Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution.

The measure states:

7. Due diligence required. Each television or radio broadcasting station, provider of cable or satellite television, print news outlet and Internet platform shall establish due diligence policies, procedures and controls that are reasonably designed to ensure that it does not broadcast, distribute or otherwise make available to the public a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement in violation of this section. If an Internet platform discovers that it has distributed a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement in violation of this section, the Internet platform shall immediately remove the communication and notify the commission.

In practice, when a newspaper accepts a request to place an advertisement, there is a limited vetting process: Is the advertiser providing a valid name, either of an individual or entity. Newspapers do not investigate the ownership structures of potential advertisers before accepting their ads. One reason the vetting of ads is limited is that providing the public with perspectives on all sides of political issues is fundamental to democracy.

Another reason is that Maine newspapers do not have the capacity to investigate and determine the ownership structure of each of their advertisers, a process that, with complex ownership structures (as are common), would require extensive research and investigation.

Making matters worse, it is not at all clear what is meant by, "due diligence policies, procedures and controls," so even if a newspaper had the resources to investigate who owned prospective advertisers, they would have no way of knowing whether the measures they had adopted were sufficient to comply with the statute.

Will the State establish guidelines? In their absence, how is a newspaper supposed to know whether it is in compliance with the law?

Other ambiguities exist.

Does an "electioneering communication" include a letters to the editor? Does it include independent platforms specific to online communication? Does any of this conflict with federal communication laws?

Because it makes it difficult if not impossible for newspapers to continue to accept political advertising, Section 7 will result in a significant chilling effect on the freedom of the press, and therefore runs afoul of the First Amendment.

It impairs the ability of newspapers to serve the public as a vibrant resource for the exchange of ideas, and to provide voters with information they need to cast their ballots and participate in their self-governance.

MPA believes that Section 7 unconstitutionally restricts and burdens speech about public issues. Newspapers are struggling enterprises, and are in no position to take responsibility for enforcing this vaguely worded and unreasonably burdensome statute.