EXHIBIT **C**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **MAINE PRESS ASSOCIATION** )<br>)<br>**and** )<br>)<br>**MAINE ASSOCIATION OF** )<br>**BROADCASTERS,** )<br>)<br>         **Plaintiffs,** )<br>)<br>**v.** )<br>)<br>**MAINE COMMISSION ON** )<br>**GOVERNMENTAL ETHICS AND** )<br>**ELECTION PRACTICES, et al.** )<br>)<br>         **Defendants.** )  | Civil Action No. _____ |

**DECLARATION OF TIMOTHY MOORE IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746, I, Timothy Moore, declare and state as follows:

1. I am President/CEO of The Maine Association of Broadcasters ("**MAB**").

2. MAB is a non-profit organization representing over 130 Radio and Television Stations in the State of Maine. MAB advocates for broadcasters statewide on issues of importance to FCC-regulated licensees/operators and by extension to all citizens of Maine they serve.

3. With over 30 years of experience in Maine, I am in constant contact with owners, station managers and rank-and-file workers in the broadcast industry, seeking their input on concerns they have regarding their economic interests and their never-ending dedication to serving Maine communities. I also have decades of experience managing commercial radio stations.

1

4. I respectfully submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order/Preliminary Injunction. I describe my objections to the portion of An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution (the "**Act**") applicable to Maine broadcasters, including their stations and their websites.

5. On July 12, 2023, following a unanimous vote of the MAB Board of Directors, we submitted a letter urging Governor Janet Mills to veto L.D. 1610, which became Question 2 on the November 2023 ballot; our letter is attached as **Exhibit 1**.

6. Maine Radio & TV stations are expressly targeted for regulation in Section 7 of the Act. In addition, some Maine Radio & TV stations operate websites which run political advertisements and thus MAB members are also subject to regulation under section 7 of the Act because they operate what the Act describes as "Internet Platforms."

7. Maine Radio & TV stations broadcast paid content from both individuals and businesses advertising products and services as well as from political, advocacy and non-profit organizations and entities communicating views about the issues of the day, including the nomination or election of a candidate or the initiation or approval of a referendum.

8. MAB objects to Section 7 of the Act because it (A) imposes vague and ambiguous standards on Maine Radio & TV stations making it impossible for our members to know what they are legally allowed to do; (B) requires Maine Radio & TV stations to institute burdensome due diligence regulations that will cause them to delay or not run at all some significant amount of truthful political speech that MAB members would have broadcast in the past; and (C) requires Maine Radio & TV stations to remove truthful political speech thus taking away their right to exercise their own independent judgment about what their audiences should be able to

see and hear. The Act threatens Maine Radio & TV stations with substantial financial penalties if they do not comply.

**Vague and Confusing Standards**

9. The provisions of Section 7 of the Act are unclear and confusing.

10. I do not know what "due diligence policies, procedures and controls" are meant to require, but I understand that the use of the word "and" means that we are required to have all of three of them and that each of them means something different. I do not know and believe that no one knows what any of these terms mean in the context of the Act. What "due diligence policies" would be required to comply with the Act? I am unaware of any relevant policy that we might look to as a model. I do not know and believe that no one knows what "procedures" are meant to be in this context. I also do not know what "controls" means here. I gather that "due diligence policies, procedures and controls" must mean something serious and substantial because they must be "reasonably designed to ensure" (per the Act) that Maine Radio & TV stations do not make available to the public a public communication that would violate the Act, but I can only guess at what these provisions actually require of our members.

11. The "reasonably designed to ensure" standard is also vague. The statute does not say who decides what is "reasonable" and puts us at risk of being second-guessed after-the-fact about what was "reasonable." What is "reasonable" appears to be a discretionary call inviting different Maine Radio & TV stations to draw different lines between what is reasonable and unreasonable, depending on their time and resources.

12. Section 7 of the Act applies to "a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement." The Act does not say whether it applies only to payments

made to our members. The "has made" phrasing suggests to me that it may apply whenever payments or disbursements are made to anyone in connection with a "public communication." Does the Act apply to guest editorials, and other types of content for which a foreign government-influenced entity may have made a "disbursement" to someone other than our members in connection with the content? Does the Act apply even where a "public communication" is part of a news story? We are left to speculate.

13. This ambiguity is a problem because Maine Radio & TV stations do not know what they are required to do to comply with the Act. To avoid legal risk, I expect that they will end up refusing to accept some political advertisements because the Act is vague and confusing. I expect that if they cannot tell if an advertiser qualifies as a "foreign government-influenced entity" they may not accept advertisements from that advertiser. Because of ambiguity in the Act, I expect that Maine Radio & TV stations will end up not broadcasting some political advertisements that actually comply with the Act. Because the Act is ambiguous, it will cause Maine Radio & TV stations to delay or reject some political advertisements and that will hurt broadcasters' revenue.

14. As mentioned, advertisers ask MAB members to broadcast and post to their websites advertisements within hours of order placement. The Act's ambiguity and due diligence requirements (as described below) will be time consuming and costly as MAB members attempt to determine whether an advertiser complies with the Act. Audiences will not see or hear some advertisements as quickly as would be true but for the Act, and some will miss seeing some advertisements altogether. People who listen to or watch our members' broadcasts one day may not do so the next day.

**Due Diligence Policies, Procedures and Controls**

15. As stated in the MAB Letter to the Governor, the Act would essentially require all Maine broadcast outlets to become "detective agencies"—tasked with determining the source of all political funding and applying some (unknown) means of obtaining the ownership structure with regard to foreign government ownership, control, or participation. The short lead time between the broadcast order and on-air placement make this task impossible.

16. Those radio and television stations that are affiliated with a network have no local ability to control, alter or remove advertising and content that is fed through the network and passed on to be broadcast on the local outlet. Advertisements that violate the Act could be delivered via a network, thus making local stations potentially liable for content not within their control.

17. Requirements for due diligence policies betray a basic lack of understanding regarding the manner in which broadcast time is placed. Often, an order is received electronically—usually from an advertising agency. The turnaround time from order received to broadcast can sometimes be a matter of hours. The advertising agency—or political organization (if an advertisement is received by a station directly) does not divulge the ownership structure of the entity placing the advertising—and ad agencies probably do not possess this information, especially to the degree of percentages owned or controlled and by what entities. And Maine Radio & TV stations typically have no way of knowing who "indirectly participates in the decision-making process" at an advertiser.

18. Our members' current advertising workflow does not include due diligence policies, procedures and controls to identify "foreign government-influenced entities." To develop due diligence policies, procedures and controls reasonably designed to ensure that they

do not broadcast, distribute, or otherwise make available to the public a communication for which a foreign government influenced entity has made an expenditure—as required by the Act—would require that Maine broadcasters hire and train staff and incur burdensome legal fees and other costs without ensuring that even internally "cleared" advertisements are in fact, allowable under the Act.

19.   This type of detective work to attempt to screen out certain types of advertisers would impose a significant administrative burden and strain already limited resources at Maine Radio & TV stations. Contrary to perception, most broadcast outlets in Maine are small businesses that struggle to meet ever-rising costs, FCC fees and requirements, all while serving the communities of Maine.

20.   Broadcast outlets are dealing with significant financial challenges with the ever-changing media landscape. These financial hardships have affected our members and the administrative burdens imposed by the Act impose considerable additional burdens on our members when their resources are already very strained.  The Act forces MAB members to divert resources from editorial and news reporting functions to perform government-mandated due diligence that has the additional downside of forcing them to screen out a source of revenue (paid advertisements) that supports their businesses. For some broadcasters, this would become an existential situation. Maine Radio & TV stations face three unsatisfactory scenarios: (a) reject political advertisements altogether and lose significant revenue; (b) accept advertisements which pass whatever due diligence procedures are employed—at a cost that may neutralize the revenue itself; or (c) accept the advertisements and revenue (with the costs of vetting the advertiser) but still risk a large fine if the station's due diligence fails to uncover evidence of foreign

government ownership exceeding 5%. None of these options are attractive. The Act discourages Maine Radio and TV stations accepting political advertisements.

21. To the best of my knowledge, information and belief, there is no list of "foreign government-influenced entities." MAB members would not be left to conduct their own investigations, which would likely vary from one broadcaster to the next depending on resources, time, and risk tolerance for potential violations of the Act.

22. To the best of my knowledge, there is no way for MAB members to reasonably identify many "foreign government influenced entities." If an entity self-identifies as a foreign government, that much would be obvious. And a few entities that have engaged in political speech in Maine are well-known to be owned in part by foreign governments. But the term "foreign government-influenced entities" (as defined by the Act) also includes several other categories of entities that our members would have no practical way to identify. To even attempt such identification would be a substantial research project.

23. I am also concerned that despite attempting to engage in burdensome due diligence, the Act's requirements could be easily evaded. Some entities may not know if they qualify as foreign government-influenced given the broad and ambiguous definition in the Act. And whether an entity qualifies may change depending on changes in ownership over time. Those entities willing to violate the Act could easily hide ownership using shell entities, making it impossible for MAB members to ferret out whether an entity is actually subject to the Act's prohibitions.

**Objection to Government Censorship**

24. Maine Radio & TV stations have a proud heritage of exercising independent editorial judgment regarding the news, opinion, and advertising content they broadcast. Our

members may decide not to broadcast certain material that in their judgment does not belong on the air or on their websites. Whether it is misleading consumer advertising, profanity or violates acceptable community standards, our members are obligated under FCC regulations—and their own judgement—to reject advertising that they deem unacceptable. Our members are proud of this track record and we guard this independence vigorously. MAB believes that maintaining freedom to broadcast political speech is an integral part of the service its members provide to the public.

25. To my understanding section 7 of the Act requires that if a Maine Radio & TV stations discovers that a public communication has been published on its website in violation of the Act it "shall immediately remove the communication" and submit some form of mandatory notification to a state government agency even if the content otherwise is accurate and meets editorial standards and FCC requirements.

26. MAB strongly objects to government telling our members that they cannot broadcast truthful political advertisements of a type that they have run for many years. Separate and apart from whatever rights our advertisers themselves may have, we believe that our members have their own independent rights as operators of radio and TV stations and websites to decide what political speech to broadcast and that those rights are protected by the First Amendment.

27. MAB strongly objects to government imposing due diligence requirements and telling MAB's members to immediately remove truthful political advertisements, but exempting other businesses that make available public communications for which foreign government-influenced entities have made an expenditure, independent expenditure, electioneering communication or disbursement, including persons who engage in political speech using

21225484.1

billboards, signs, pamphlets, books, and websites. As for websites in particular, Maine cannot possibly expect to regulate all websites around the globe. This is a loophole for anyone wishing to influence Maine voters or elections.

28. MAB strongly objects to government dictating to us that we immediately remove truthful political advertisements when, on information and belief, foreign government-influenced entities are able to pay for content intended to influence elections on social media websites like Facebook, Instagram, Tik-Tok, YouTube, and similar online platforms but they are, on information and belief, exempt from complying with the Act because of Section 230 of the Communications Decency Act of 1996 (47 U.S.C. § 230).

29. MAB strongly objects to the threat of substantial financial penalties if our members do not comply with the Act.

30. Because of the substantial compliance burdens, threat of liability, and precedent that would be set by acceding to a government regulation of our political advertising content, broadcasters in Maine would necessarily have to reexamine whether to accept political issue advertising. They would not take such a decision lightly. The loss of political advertising would have a meaningful financial impact on them and would likely reduce the resources available to newsrooms, which are supported by advertising revenue. Each station's investment in news, public affairs and community service is directly impacted by the overall economic health of that local operation. Significant revenue declines resulting from this Act will compel stations to cut back operational costs, with expensive news operations often the first budget item to suffer. This is not a good outcome for Maine communities.

**Our Mission**

31. The loss of political advertising would be a loss to audiences and would undermine MAB's mission and the missions of our members. Protecting our members right to engage in political discourse is central to our mission. Maine Radio & TV stations are one of the primary forums for discussion of local candidates and political issues in Maine, including referenda. Maine broadcasters devote significant airtime to referenda issues, including objective news reporting about, for example, ballot questions. Advocacy for one side or another takes place largely in advertisements, where each side has the opportunity to state their case. An informed electorate should hear all points of view, but the Act would effectively silence some points of view because the speaker is tainted with as little as 5% foreign government ownership regardless of whether a foreign government has any influence or role in the advertisement.

32. Also of concern to me is that the Act applies to friendly allies of the United States like Canada, with which Maine shares close historic ties, and which to the best of my knowledge, information and belief, has not engaged in fraudulent schemes to influence Maine elections.

33. The loss of the political speech barred by the Act would undermine the democratic process in the communities we serve. While foreign entities with more than 5% foreign government ownership are present in Maine—and are stakeholders in referenda issues (as in this fall's campaign for Question 3, which proposed a publicly owned power company)—these entities are legal, they employ thousands of Maine people, and pay Maine income and property tax. To silence them in what may be an existential (for them) political debate is unfair and contrary to the First Amendment.

34. I share concern about fake social media activity and advertisements by foreign governments hostile to the United States through automated social media platforms like

Facebook or Tik Tok. But I am unaware of any effort by a foreign government to use of fake accounts or deliberately false speech to manipulate advertising or other content broadcast on air or published on websites of Maine Radio & TV stations.

35.   I do not believe the Act's provisions regarding news and broadcast organizations effectively address the issue of fake social media activity because there are too many loopholes. The Act does not control fake accounts on social media or offshore websites.  Nefarious actors could easily hide their ownership making it impossible for Maine Radio & TV stations to distinguish between advertisers that are permitted to broadcast political speech in Maine and those that are prohibited by the Act from doing so. Maine citizens are exposed to these social media messages constantly. Imposing due diligence and censorship obligations on Maine broadcasters is not going to put a dent in that activity.

36.   For the reasons explained above, I respectfully urge the Court to enjoin enforcement of section 7 of the Act.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6 date of December, 2023.

Signed:   /s/ Timothy G. Moore

Printed Name   Timothy G. Moore

21225484.1