EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **MAINE PRESS ASSOCIATION** )<br>)<br>**and** )<br>)<br>**MAINE ASSOCIATION OF** )<br>**BROADCASTERS,** )<br>)<br>        **Plaintiffs,** )<br>)<br>**v.** )<br>)<br>**MAINE COMMISSION ON** )<br>**GOVERNMENTAL ETHICS AND** )<br>**ELECTION PRACTICES, et al.** )<br>)<br>        **Defendants.** ) | Civil Action No. _____ |

**DECLARATION OF COURTNEY SPENCER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746, I, Courtney Spencer, declare and state as follows:

1. I am Vice President of Advertising for the Maine Trust for Local News (METLN) and President of the Maine Press Association (MPA), where I also serve on MPA's legislative committee.

2. METLN is a group of 5 daily and 17 weekly papers in Maine dedicated to the communities we serve by publishing local and regional news and information including investigative reporting.

3. I have been in a sales leadership position since 2010 when I became sales director leading the Portland Press Herald sales team. Over time my responsibilities have expanded. I now oversee the sales teams for Portland Press Herald, The Times Record, The Forecaster group, The American Journal, Lakes Region Weekly, and 5 additional weeklies covering southern Cumberland and York counties.

1

4. I respectfully submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I describe my objections to the portion of An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution (the "**Act**") applicable to members of MPA and the METLN.

5. The MPA submitted a letter urging Governor Janet Mills to veto the Act (L.D. 1610), which became Question 2 on the November 2023 ballot.

6. The MPA board voted to adopt a policy opposing the Act.

7. Members of the MPA, which include METLN would be subjected to Section 7 of the Act, which is labeled "Due diligence required."

8. METLN operates 4 websites with combined traffic of millions of unique users per month. As a result, METLN website's are subject to the requirements imposed on "Internet Platforms" under Section 7 of the Act.

9. The Maine Press Association's members, including METLN, publish paid content, in print and online, from both individuals and businesses advertising products and services as well as advertisements by political, advocacy and non-profit organizations and entities communicating views about the issues of the day, including the nomination or election of a candidate or the initiation or approval of a referendum.

10. I am concerned that Section 7 of the Act singles out news outlets, including Maine Press Association members and METLN by (A) imposing vague and ambiguous standards making it impossible for us to know what we are legally allowed to do; (B) requiring us to institute burdensome due diligence regulations that will cause us to delay or not run at all some significant number of truthful political speech that we would have published in the past; (C) requiring us to remove truthful political speech that in our judgment our readers otherwise

should be able to see/hear. The Act threatens METLN with substantial financial penalties if we do not comply.

**Vague and Confusing Standards**

11. The provisions of Section 7 of the Act are unclear and confusing. I do not know what "due diligence policies, procedures and controls" are meant to require, but I understand that the use of the word "and" means that we are required to have all of three of them and that each of them means something different. I do not know and believe that no one knows what any of these terms mean in the context of the Act. What "due diligence policies" would be required to comply with the Act? I am unaware of any relevant policy that we might look to as a model and this term has no meaning in the news business that I am aware of. I do not know and believe that no one knows what "procedures" are meant to be in this context. I also do not know what "controls" means here. I am left to guess at what these provisions actually require of our organization and Maine Press Association members.

12. The "reasonably designed to ensure" standard is also vague. The statute does not say who decides what is "reasonable" and puts us at risk of being second-guessed later when someone will decide what was "reasonable" after-the-fact.

13. This ambiguity is a problem because we do not know what we are required to do to comply with the Act. Because the Act is vague and confusing and to avoid legal risk, I expect that we will end up refusing to accept some number of political ads that we are in fact not prohibited from publishing. I expect that if we cannot tell if an advertiser qualifies as a "foreign government-influenced entity" we may not accept that advertiser's ads.

14. Because of ambiguity in the Act and its burdensome due diligence requirements, I also expect that we will delay accepting and publishing some political speech. Advertisers often

21245861.1

ask us to print advertisements immediately or very soon after having paid for an advertisement. We are often asked to get an advertisement online immediately or to publish as soon as possible. A due diligence requirement would be time consuming and would end up delaying publication of some advertisements while we attempt to determine whether the advertiser complies with the Act. Our readers will not see some advertisements as quickly as would be true but for the Act and some may miss seeing some advertisements altogether. People who read our newspapers or websites one day, may not read them the next day.

**Due Diligence Policies, Procedures and Controls**

15. Our current advertising workflow does not include due diligence policies, procedures and controls to identify "foreign government-influenced entities." To develop due diligence policies, procedures and controls reasonably designed to ensure that we do not distribute, or otherwise make available to the public a communication for which a foreign government influenced entity has made an expenditure—as required by the Act—would require that we burden salespeople with the responsibility of researching the ownership of each entity placing political/advocacy advertising. This is not an appropriate use of their time and skills and thus we would need to hire new staff, divert resources, or retrain staff to comply with the Act.

16. I do not believe that the drafters of the Act understood the current vetting process, which includes review and acceptance of the content of the advertising (based on our own independent discretion), ensuring that there is no preferential pricing for any political/advocacy ads, and requiring payment prior to publishing. We do NOT research the ownership of our advertisers. Many of these ads come through agencies retained by the organizations. The organization placing the ad is sometimes not known to us until close to the publication date. If we ask agencies to verify ownership prior to responding to their inquiries they would likely be

unable to comply and look for other platforms to disseminate their messages, likely using social media or other entities not subject to the Act. This would deprive our organizations of revenue while doing nothing to address the issue that the drafters of the Act were trying to address.

17. In addition, because of the ambiguity of the Act, each MPA member organization would have to develop their own process which would likely differ from one organization to the next, leading to a patchwork of policies and procedures creating a porous and variable due diligence process across many news outlets across Maine. How would the state identify if a policy and procedure were sufficient? Would they review each publisher's policy? How does the state propose to create an equitable process for application of the Act when each publisher has their own policy?

18. The type of detective work required by the Act to attempt to screen out certain types of advertisers would impose a significant administrative burden and strain already limited resources. For example, if an individual approached us to place an advertisement how would we ascertain if that person was paid by a foreign entity for doing so? Similarly, how would we know if a wholly owned US organization approached us to place such advertisements was being subsidized/paid by a foreign entity? The Act will in fact create more burden with almost no assurance that we could meet the letter and spirit of the Act no matter how strenuous the policy, procedures and controls. The only clear way to meet the burden would be to eliminate advocacy/political advertisements completely. This would cause serious financial harm to MPA members and METLN, including likely job losses and a reduced resources to meet our journalistic mission.

19. News organizations have struggled financially as a result of changes in our industry, including decline in print subscriptions and shift to digital advertising, which generally

produces less overall revenue than traditional print advertisements. These financial hardships have affected our organization and the administrative burdens imposed by the Act impose considerable additional burdens on us when we are already very strained. The Act forces us to divert resources from our editorial and news reporting functions to perform government mandated due diligence that has the additional downside of forcing us to screen out a source of revenue (paid advertisements) that supports our newsroom.

20. To the best of my knowledge there is no list of "foreign government-influenced entities." We would not be able to effectively determine whether many entities fall within that definition. And even if such a list did exist this would not eliminate the impossible challenge of researching whether US have been paid by a foreign government-influenced entity.

21. To the best of my knowledge, there is no way for us to reasonably identify many and likely most "foreign government influenced entities." If an entity self-identifies as a foreign government, that much would be obvious. A few entities that have engaged in political speech in Maine are well-known to be owned in part by foreign governments. But the term "foreign government-influenced entities" (as defined by the Act) also includes several other categories of entities that we and MPA members would have no practical way to identify.

22. To my understanding, "foreign government influenced entities" (as defined by the Act) includes, "[a] firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity . . . [h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests[.]" To reasonably insure that we and our MPA members identify every entity that qualifies under

this standard and screen out any political advertising they ask us to print/make available to the public on our website would be a very substantial undertaking.

23. After 13 years working with sales teams on advocacy/political advertising I have no confidence at all that we would be able to comply with the Act no matter how much effort we applied to doing so. As I stated previously, there is no clear way to identify which advertisements would be acceptable and which would not. Here is one example: We regularly receive advocacy advertising from the Gulf of Maine Research Institute. This advertising is placed through the advocacy group of a local law firm. If the Gulf of Maine Research Institute receives grants/donations/subsidies or other income from a foreign government entity or includes a member of the board connected to a foreign government entity, would we be able to accept that advertising?

24. Even if larger publishing companies invest significant money and resources in an attempt to comply with the Act, what about the small publications, which make up the bulk of our MPA members? It is not unrealistic to conclude that some of these organizations would not be able to survive the burden of the Act either due to loss of revenue or due to the considerable expense of trying to comply with it.

25. I am also concerned that the due diligence requirements would be burdensome on could be easily evaded. Entities willing to violate the Act could easily hide ownership using shell entities, making it impossible for us to ferret out whether the entity is actually subject to the Act's prohibitions.

**Objection to Government Censorship**

26. We have a proud and heritage of exercising independent editorial judgment regarding the news, opinion, and advertising content we publish. Throughout our history, the

MPA and the newspapers now owned by METLN have exercised independent editorial judgment about the political speech we publish, including paid advertisements. Our members routinely decide not to publish material that in our judgment does not belong in the pages of our newspaper or on our website. As previously stated, we do review and make judgements about publishing advocacy/political advertising based on the content, which is our right as a news organization to do. If an ad contains unsubstantiated/undocumented negative language about another candidate, we would reject the ad in its current form. We guard this independence vigorously and believe that maintaining our freedom to publish is an integral part of the service we provide to the public and our readers.

27. To my understanding section 7 of the Act requires that if we discover that a public communication has been published on our website in violation of the Act we "shall immediately remove the communication" and notify a state government agency even if the content otherwise is accurate and meets our editorial standards. Even printed publications often have a digital "ePaper" companion. Would we be obligated to revise and remove the ad? To redact part of our ePaper? This would be another burden placed on our members.

28. We strongly object to government telling us that we cannot publish truthful political advertisements of a type that we have published for many years. Separate and apart from whatever rights our advertisers themselves may have, we believe that we have our own independent rights as operators of print newspapers to decide what we publish and that those rights are protected by the First Amendment.

29. We strongly object to government imposing due diligence requirements and telling us to immediately remove truthful political advertisements, but exempting other businesses that make available public communications for which foreign government-influenced

21245861.1

entities have made an expenditure, independent expenditure, electioneering communication or disbursement, including persons who engage in political speech using billboards, signs, pamphlets, books, websites and social media.

30. As for websites in particular, Maine cannot possibly expect to regulate all or any websites (or Internet platforms, whatever that means) around the globe. This is a massive loophole for anyone wishing to influence Maine voters or elections. With the current challenge of misinformation abounding, the Act will do nothing to eliminate the problem they are trying to solve except burden the very publications tasked with truthful, objective reporting.

31. Page views and readership on social media/websites such as META, X, and YouTube are vastly greater than METLN's websites, but they are known for disseminating misinformation on a regular basis and yet they would not, to the best of my information and belief, be required to comply with the Act.

32. I share concern about fake social media activity and advertisements by foreign governments hostile to the United States through automated social media platforms like Facebook. But I do not believe the Act's provisions regarding news organizations effectively address the issue of fake social media activity because there are too many loopholes. The Act does not control fake accounts on social media, offshore websites, and nefarious actors could easily hide their ownership making it impossible for us to distinguish between advertisers that are permitted to publish political speech in Maine and those that are prohibited by the Act from doing so.

33. We strongly object to government dictating to us that we immediately remove truthful political advertisements when we understand that foreign government-influenced entities are able to pay for content intended to influence elections on social media websites like

Facebook, Instagram, Tik-Tok, YouTube, and similar online platforms but they are, to my understanding, exempt from complying with the Act because of Section 230 of the Communications Decency Act of 1996 (47 U.S.C. § 230).

34. Because of the substantial compliance burdens, potential liability, and precedent that would be set by acceding to a government regulation of our political advertising content, we would necessarily have to reexamine whether to accept political advertising. We would not take such a decision lightly. The loss of political advertising would have a meaningful financial impact on us and would almost certainly reduce the resources available to our newsroom, which is supported by advertising revenue, instead diverting resources to attempt to comply with a vague and ambiguous policy.

**Our Mission**

35. The loss of political advertising would be a loss to our readers and would undermine our mission. Political discourse is central to our mission. We are one of the primary forums for discussion of local candidates and political issues in Maine, including referenda. As publishers' we provide context and facts for our readers and that includes accepting advertising on both sides of an issue so our readers have the most information to inform their views and votes. In our view, an informed electorate should hear all points of view, but the Act would effectively silence some points of view because the speaker is tainted with even a small percentage of foreign government ownership and regardless of whether the foreign government has any influence or role in the advertisement.

36. Also of concern to me is that the Act does not distinguish between friendly allies of the United States like Canada, with which Maine shares close ties, and hostile foreign actors. I expect that the result of the Act would be an increase in one-sided advertising campaigns on

important issues in Maine. The loss of the political speech barred by the Act would, in my view, undermine the democratic process in the communities we serve- at a time when our communities need more information not less.

37.     For the reasons explained above, I respectfully urge the Court to enjoin enforcement of section 7 of the Act.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th date of December, 2023.

Signed: __/s/ Courtney N. Spencer__

Printed Name __Courtney N. Spencer__